Filed 12/1/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| DOLE FOOD COMPANY, INC., et al., | B262044 |
| Petitioners, | (Los Angeles County Super. Ct. Nos. NC053643, BC499369 [related case Nos. NC053684, NC053766, BC433429, BC433430, BC433656, BC433657, BC454472, BC544786]) |
| v. | |
| SUPERIOR COURT OF LOS ANGELES COUNTY, | |
| Respondent; | |
| SHELL OIL COMPANY et al., | |
| Real Parties in Interest. | |

Petition for writ of mandate from an order of the Superior Court of Los Angeles County, William F. Highberger, Judge. Petition denied.

Gibson, Dunn & Crutcher, Andrea E. Neuman, Thomas A. Manakides and William E. Thomson for Petitioners.

Frederick Bennett for Respondent.

Girardi Keese, Thomas V. Girardi, Robert W. Finnerty and Christopher T. Aumais; Law Offices of Martin N. Buchanan and Martin N. Buchanan for Real Parties in Interest Adelino Acosta et al. and City of Carson.

Morgan, Lewis & Bockius, David L. Schrader and Deanne L. Miller for Real Parties in Interest Shell Oil Company and Equilon Enterprises LLC.

This mass tort litigation arises out of an environmental investigation which revealed that soil beneath a housing tract in Carson, California, was contaminated with residual petroleum hydrocarbons. In this writ proceeding challenging the trial court's determination of good faith settlements, we are called upon to address whether a government-ordered environmental cleanup was part of the settlement consideration, and whether the good faith settlement could be approved without an individualized allocation of the settlement proceeds among the numerous plaintiffs and between their economic and noneconomic damages.

Petitioners Dole Food Company, Inc. (Dole), Oceanic Properties, Inc. (Oceanic), and Barclay Hollander Corporation (Barclay Hollander) (collectively, Developer Defendants) seek a writ of mandate directing respondent superior court to vacate its order approving good faith settlements (Code Civ. Proc., § 877.6)[1] between codefendants Shell Oil Company (Shell) and Equilon Enterprises LLC dba Shell Oil Products US (Equilon) (collectively Shell) and approximately 1,491 individual plaintiffs (Adelino Acosta et al.) (collectively, Plaintiffs) as well as plaintiff City of Carson (Carson). We issued an order to show cause.

The essential issues presented are twofold. First, we address whether the trial court erred in approving the good faith settlements without first calculating the monetary value of Shell's obligation to comply with a cleanup and abatement order of the California Regional Water Quality Control Board (Water Board) to implement a Remedial Action Plan (RAP) which allegedly will cost Shell $146 million. The nonsettling Developer Defendants contend the exclusion of the cost of the RAP from the settlement valuation is collusive and will enable Plaintiffs to obtain a windfall, by reducing the amount that will be set off against the nonsettling defendants' liability. Second, we address whether the trial court erred in approving the $90 million good faith

---

[1] All further statutory references are to the Code of Civil Procedure, unless otherwise specified.

settlement between Plaintiffs and Shell without an allocation of the settlement proceeds among the various Plaintiffs, and between their economic and noneconomic damages.[2]

We conclude that Shell's compliance with the RAP, which was mandated by the Water Board pursuant to the state's police powers, was not part of the settlement consideration, and therefore should not be included in the valuation of the good faith settlement. Although the trial court gave some weight to the value of the RAP remediation in approving the good faith settlements, the error was harmless; on the record presented, the $90 million monetary payment, standing alone, was well within the range of Shell's proportionate liability.

Finally, the determination of good faith settlement did not require an allocation of the $90 million settlement consideration among the 1,491 individual Plaintiffs and between their economic and noneconomic damages. Such individualized allocations, which would have necessitated 1,491 mini-trials in this matter, are not required as part of the good faith settlement process.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Parties*.

The petitioners, the three Developer Defendants, are codefendants in two related actions currently pending in respondent superior court, *Adelino Acosta, et al. v. Shell Oil Company, et al*. (L.A. Super. Ct. No. NC053643 and related cases) (the *Acosta* action) and *City of Carson v. Shell Oil Company, et al*. (L.A. Super. Ct. No. BC499369 and related cases) (the *Carson* action).

Real parties in interest are: codefendants Shell and Equilon, whose joint motion for determination of good faith settlement was granted by the trial court; approximately

---

[2]    The allocation is of concern to the nonsettling defendants because under Proposition 51, " 'only that part of the settlement value attributable to plaintiff's *economic* damages may be credited against the nonsettling defendants' liability.' " (*Espinoza v. Machonga* (1992) 9 Cal.App.4th 268, 275 (*Espinoza*); see generally, *Bostick v. Flex Equipment Co., Inc*. (2007) 147 Cal.App.4th 80, 89-90.)

3

1,491 individual plaintiffs in the *Acosta* action (Plaintiffs), who settled their claims against Shell; and plaintiff Carson, which also settled its claims against Shell.

### 2. *Sale and redevelopment of the site.*

The 1,491 individual plaintiffs lived or worked in or near the Carousel housing tract, a neighborhood of approximately 285 homes in Carson, California. Between the 1920's and the early 1960's, Shell owned and operated three crude oil storage reservoirs, known as the Kast Tank Farm, at the site which later was developed as the Carousel tract. It is alleged that at least one of the storage tanks was leaking its contents into the soil, causing the site to become contaminated with toxic substances.[3]

In October 1965, Shell entered into an agreement to sell the land to Richard Barclay and his associates (Barclay), a group of residential developers who intended to convert the property into a residential subdivision. Shell transferred title to the property in October 1966. In preparation for the change in use, the oil storage reservoirs were decommissioned, the reservoir walls were torn down and buried on site, and the land was graded for home construction.[4] The land was rezoned from industrial to residential, and the Carousel homes were constructed and sold by the early 1970's.

### 3. *Cleanup and abatement order against Shell.*

In 2008, after discovering contamination nearby, the Water Board directed Shell to conduct environmental testing at the Carousel tract. These investigations revealed the presence of petroleum hydrocarbons in the areas where Shell's former oil reservoirs had been located. In March 2011, the Water Board issued a cleanup and abatement order to Shell, directing it to submit a proposed remediation plan. This order was based on Shell's "ownership of the former Kast Property Tank Farm" and its "former operation of a petroleum hydrocarbon tank farm at the Site."

---

[3]     Shell denies it was aware that oil was leaking into the soil.

[4]     There is a dispute as to Shell's role in preparation of the site.

4

After submitting an initial RAP that was rejected, Shell submitted a revised RAP in June 2014, with an addendum in October 2014.[5] Under the revised RAP, Shell will, inter alia, excavate five to ten feet beneath the homes, following excavation will install a vapor extraction and venting mechanism, and will institute comprehensive long-term monitoring. In addition, Shell will provide temporary relocation assistance in connection with implementing the RAP, and will compensate Carousel homeowners to ensure they receive fair market value if they elect to sell their homes.[6]

Shell's corporate representative, William Platt, has estimated it will cost Shell $146 million to implement the RAP.

4. *Superior court proceedings*.

Apart from the Water Board proceeding, there are three pending actions in the superior court relating to Shell's use and sale of the site.

a. *The* Acosta *action*.

In October 2009, seventeen months after the Water Board ordered Shell to conduct an investigation of the site, the numerous individual plaintiffs filed their lawsuit. They are current and former Carousel homeowners and other persons who lived or worked in the vicinity of the site.

The operative second amended complaint (SAC), filed in May 2011, named as defendants Shell and Equilon, the alleged purchasers of the Kast property in 1922, as well as three successors to the original developers, namely, Barclay Hollander, later acquired by Oceanic and then Dole. The SAC asserted 12 causes of action against all the defendants, to wit: negligence, intentional infliction of emotional distress, strict liability

---

[5] According to real parties, the Water Board recently approved the revised RAP.

[6] The Water Board staff subsequently recommended that Barclay Hollander, as a successor to the past owner and developer of the property, be named as a discharger and additional responsible party to the 2011 cleanup and abatement order. According to the returns to the petition, the Water Board recently adopted the staff's recommendation, thus making Barclay Hollander responsible for contributing to the cost of the board-ordered remediation.

5

for ultra-hazardous activity, permanent trespass, continuing trespass, public nuisance, private nuisance, fraudulent concealment, negligent misrepresentation, public continuing nuisance causing special injury, public permanent nuisance causing special injury, and fraudulent and intentional deceit. Plaintiffs prayed for monetary and injunctive relief, including remediation, for their alleged injuries to property, and monetary damages for alleged personal injuries, including medical expenses, emotional distress, and medical monitoring.

As against Shell, the SAC alleged, inter alia, that Shell's liability arises out of its ownership and operation of the leaking oil reservoirs, that Shell sold the site to the developers "without fully disclosing the true extent of the dangerous contamination," and that "[d]espite [its] superior knowledge of [the] hazards and likely injury to individuals such as PLAINTIFFS, [Shell] failed to disclose [its] knowledge and/or take any actions to warn subsequent purchasers of the [presence of] toxic chemicals."

The trial court subsequently granted Shell's motion to strike Plaintiffs' claims for property damage as against Shell on statute of limitations grounds. (Code Civ. Proc., § 338.)[7]

> b. *The* Carson *action*.

In January 2013, Carson, represented by the same law firm representing Plaintiffs, filed suit against Shell and Developer Defendants alleging public nuisance and inverse condemnation. By way of relief, Carson requested "full and total abatement of the contamination down to approximately 40 feet below the Carousel neighborhood." Before the parties engaged in any discovery, the trial court stayed the *Carson* action.

---

[7] The parties differ as to whether the trial court's order eliminated all property damage claims against Shell, or whether Plaintiffs' claims against Shell for continuing nuisance and continuing trespass survived that ruling. We note that at the hearing on the motion for determination of good faith settlement, the trial court stated "Shell is out on the property damages; Shell is in on personal injury." The trial court then added, however, "[t]*here may be some more*, but the heart of it is . . . personal injury." (Italics added.)

6

c. *The indemnity action and cross-action.*

In May 2014, Shell sued Barclay Hollander and others, seeking indemnity and contribution with respect to the *Acosta* action, the *Carson* action, and the cost of complying with Water Board orders. Shell alleged it had already incurred more than $40 million in costs and expenses for site investigation and remediation.

In October 2014, Barclay Hollander filed a cross-complaint against Shell, seeking indemnity and contribution on the ground that Shell contaminated the site and failed to disclose the contamination. Barclay Hollander also sought a declaration that Shell was not entitled to indemnification.

5. *Shell's settlements in the* Acosta *and* Carson *actions.*

In October 2014, Shell reached settlements with Plaintiffs and Carson, with an effective date of November 10, 2014.

a. *The* Acosta *settlement agreement.*

The *Acosta* settlement agreement requires Shell to pay Girardi Keese (counsel for both Plaintiffs and Carson) $90 million in "full and final settlement of all Claims of all Plaintiffs," with Girardi Keese to be "solely responsible for determining the process by which the Settlement Funds are allocated" among the Plaintiffs.

Under the terms of the *Acosta* settlement agreement, Shell would deliver 90 percent of the settlement funds to Girardi Keese once certain conditions are satisfied, including: Girardi Keese's delivery to Shell's counsel of signed individual releases from at least 90 percent of the individual Plaintiffs (with Girardi Keese remaining under a continuing obligation to secure releases from the remaining Plaintiffs); issuance of a final order approving all settling minors' compromises; issuance of a final order determining the settlement to be in good faith; and the filing of executed requests for dismissal with prejudice of the *Acosta* litigation and the *Carson* action, with the parties to bear their own fees and costs.

The *Acosta* agreement expressly addresses the Water Board proceeding. At paragraph 3.6, it requires Plaintiffs and Girardi Keese "to cooperate in good faith in the

7

ongoing regulatory proceedings overseen by the Water Board," and requires Plaintiffs to "waive and release any rights to challenge any decision of the Water Board in evaluating and approving the RAP for the Carousel Tract." It also includes an acknowledgement that the "Agreement fully and fairly addresses and compensates [Plaintiffs] for any and all claims against Shell for alleged nuisance . . . and/or any other RAP-related impacts created by the alleged contamination of the Carousel Tract and implementation of the RAP." Paragraph 3.7 thereof requires Plaintiffs to provide access for investigation and RAP implementation, and provides that "Shell's work on the Carousel project shall continue to be done only in accordance with Water Board-approved work plans." To enforce these provisions, the agreement requests that the superior court "retain jurisdiction over the Parties and the Actions for purposes of finalizing and enforcing the Agreement, including, without limitation, the provisions requiring cooperation in the ongoing regulatory proceedings overseen by the Water Board, access to properties, and implementation of the RAP."

To determine the allocation of the $90 million settlement proceeds among the 1,491 individual Plaintiffs, Shell and Plaintiffs stipulated to, and the trial court ordered, the appointment of retired Justice Edward Panelli as Special Master to oversee the settlement and subsequent apportionment of the funds.[8]

The *Acosta* settlement agreement does not differentiate between economic and noneconomic damages. If there were a pro rata distribution, each plaintiff would receive approximately $60,362 minus attorney fees and costs. Once the *Acosta* settlement is funded, Justice Panelli will make an allocation to each plaintiff, based upon the plaintiff's inclusion in one of four categories: cancer claims; non-cancer personal injury claims; medical monitoring and/or fear of cancer only; or property damage without physical personal injury.

---

[8] According to Plaintiffs' counsel, in mass tort cases it is common practice for the parties to agree upon a global settlement with a future allocation among the plaintiffs to be made by plaintiffs' counsel or a retired judge or mediator.

8

b. *The* Carson *settlement agreement.*

Unlike the *Acosta* settlement, the *Carson* settlement did not include a cash payment. Rather, it consisted of mutual releases of all claims (although it does not appear that Shell had asserted any claims against Carson) and a waiver of costs. The *Carson* settlement defined the term "claim(s)" as specifically excluding "any benefits provided for in the revised [RAP]," and it included a representation by Shell that "the RAP is separate from this Agreement and any other settlement agreements in this Action." The *Carson* settlement required Carson to "cooperate in good faith" in the Water Board proceedings and the "implementation of the RAP," and sought retention of jurisdiction by the superior court in "implementation of the RAP" and enforcement of the settlement agreement.

6. *Good faith settlement proceedings.*

a. *Shell's motion for good faith settlement.*

On December 12, 2014, Shell filed a motion for an order determining that the two settlements, between Plaintiffs and Shell, and Carson and Shell, were entered into in good faith, so as to bar any claims against Shell for indemnity or contribution arising out of this matter. Shell asserted its payment of $90 million to settle Plaintiffs' clams, along with Carson's dismissal of its public nuisance action in exchange for a mutual release and waiver of costs, were well within the reasonable range of Shell's alleged proportionate liability.

Shell emphasized that a good faith settlement does not require "perfect or even nearly perfect apportionment of liability. In order to encourage settlement, it is quite proper for a settling defendant to pay less than his proportionate share of the anticipated damages. What is required is simply that the settlement not be grossly disproportionate to the settlor's fair share." (*Abbott Ford, Inc. v. Superior Court* (1987) 43 Cal.3d 858, 874-875 (*Abbott Ford*).) Further, a plaintiff's *claims for damages* are not determinative in finding good faith; rather, the court is called upon "to make a 'rough approximation' of what the plaintiff would actually recover" (*West v. Superior Court* (1994) 27 Cal.App.4th

9

1625, 1636 (*West*)), with the evaluation to be made "on the basis of information available at the time of settlement." (*Tech-Bilt, Inc. v. Woodward-Clyde & Associates* (1985) 38 Cal.3d 488, 499 (*Tech-Bilt*).)

Shell asserted that notwithstanding the sizable claims by the numerous Plaintiffs, it had "multiple defenses to liability that must be factored. Shell sold the property in its as-is condition, with the crude oil storage reservoirs in place, to the Developer Defendants, who took responsibility to decommission the reservoirs and remove residual wastes. Property damage claims cannot be recovered against Shell in light of the Court's prior ruling and Shell's RAP-related efforts. Personal injury claims are likely subject to challenge on general and specific medical causation grounds, among other defenses. In addition, there have been no expert designations or discovery yet on the issue of Plaintiffs' alleged damages. [¶] Given the facts and circumstances of these cases where liability is contested and fault lies with the non-settling Developer Defendants, Shell's $90 million settlement payment is well 'within the ballpark' of its potential liability. It cannot be shown that the settlement is 'grossly disproportionate' to what a reasonable person at the time of settlement would estimate Shell's proportionate liability to be."

The supporting declaration of Attorney Deanne Miller stated in part: The trial court randomly selected 50 test plaintiffs, and the pool subsequently was narrowed to 35 individuals. Extensive fact discovery was conducted regarding each of the test plaintiffs, which revealed their claims were subject to substantial potential defenses. There were no clusters of disease among the test plaintiffs, most of whom claimed a variety of common illnesses and ailments. Further, although no expert discovery had been conducted yet on causation, establishing causation would be challenging for Plaintiffs. For example, one of the test plaintiffs was a 79 year old man who asserted a claim for prostate cancer. However, medical literature indicates that 80 percent of men who reach age 80 have prostate cancer. Another test plaintiff decedent allegedly died of stomach cancer; however, her medical records and treating physician's testimony indicated that she was never diagnosed with stomach cancer. Other test plaintiffs claimed

10

a variety of common illnesses and ailments such as asthma, allergies, headaches, diabetes, heart conditions and high blood pressure, but the causal connection between those diagnoses and environmental conditions in the Carousel neighborhood were "tenuous at best."

With respect to Shell's alleged liability vis-à-vis Developer Defendants, the Miller declaration relied, inter alia, on a letter dated December 1, 1965, indicating that Barclay sought permission from Shell, prior to close of sale, to conduct "site clearing work" on the property. The Barclay letter stated, "We would like to begin immediately to remove the liquid waste and petroleum residues from the property. . . . We estimate it will take about three months for completion. [¶] As we discussed, the removal of waste should improve the value of your property and, therefore, there should be no exposure to Shell Oil Company other than possible public liability, which may be incurred during the course of the work. To protect Shell against this possibility, we will furnish you with liability insurance in such form as you may require." Miller also cited a March 1966 letter from Pacific Soils Engineering, Inc. to the original developers, indicating the soil beneath one of the reservoirs at the Kast site was "highly oil stained," and that the soils had a "petroleum odor."

The Miller declaration also asserted Plaintiffs were incapable of prevailing against Shell on their fraud claims, in that discovery conducted to date indicated that Plaintiffs had no interaction with Shell -- they purchased their homes from the original developers. Thus, Plaintiffs did not rely on any statements by Shell, let alone any misrepresentation by Shell.

b. *Developer Defendants' opposition to the motion for good faith settlement.*

In opposition, Developer Defendants contended that the settling parties' joint attempt to exclude from the settlement consideration the $146 million value of the RAP was a "transparent effort to improperly minimize Developer Defendants' offset."

11

Developer Defendants argued that the trial court "should either include the full amount of the remediation in determining good faith or deny Shell's motion."[9]

Developer Defendants attacked the *Acosta* settlement as lacking in good faith. They contended Shell failed to show the $90 million settlement amount, which represented less than one percent of Plaintiffs' $11 billion in alleged damages, was within the ballpark of Shell's proportionate liability.[10]

Developer Defendants also contended the *Carson* settlement was not in good faith because it purported to exclude Shell's costs in implementing the RAP. By excluding the value of the RAP, the *Carson* settlement "is a walk away in which Shell is not paying a dime," even though the *Carson* action sought abatement of the contamination to a depth of 40 feet below the Carousel neighborhood.

Developer Defendants argued that the entire settlement consideration must be assigned a dollar value, including any non-monetary relief. "[A]ny settlement that is not purely cash must be assigned a dollar value." Here, by excluding the value of the RAP remediation, the settlement failed the good faith standard.

Developer Defendants also argued that Shell's failure to allocate the settlement proceeds was fatal to a good faith determination. "There are 1,491 individual Plaintiffs with varying claims. Allocating the settlement proceeds among them and their alleged injuries is necessary to ensure that the offset, and thus the settlement, are fair to Developer Defendants." They contended the trial court could not determine good faith without knowing how the settlement proceeds were being allocated between Plaintiffs' economic and non-economic damages, and among the 1,491 individual plaintiffs.

---

[9]  In the court below, Developer Defendants offered to stipulate to a good faith settlement determination if Shell and Plaintiffs included the $146 million value of the RAP in the economic damages offset.

[10]  Plaintiffs deny they sought $11 billion in damages.

c. *Hearing and trial court's ruling.*

On January 30, 2015, the matter came on for hearing. After hearing arguments of counsel, the trial court granted the motion for good faith settlement consistent with its tentative ruling, which provided in substance:

"Moving parties have set forth the particulars of their settlement with plaintiffs and the current state of knowledge about their commitment to abate the underlying pollution nuisance. Some aspects of the contract are definite (e.g. the commitment to pay the many plaintiffs and their counsel $90M in the aggregate) whereas some aspects of the settlement are necessarily imprecise estimates, e.g. the cost/value of Shell's commitment to perform abatement as directed by the [Water Board]. There are over 1,400 plaintiffs and many separate parcels of real estate at issue in this case, most of which are in fairly close proximity to each other.

"The test plaintiffs' settlement demands, when extrapolated over the full set of 1,400 [plus] plaintiffs produce a very large number, but any experienced civil judge (or [personal injury] litigator) knows that there is huge variance between a plaintiff's 'best case' demand and associated hopes for a heroic victory at trial as compared to the much more common reality that some more pallid amount is awarded by a jury in due course once a typical [personal injury] case is tried. While this case has been pending for some time, in many ways the moving parties are settling early and thus deserve a substantial discount, especially because vitally important expert discovery is still in mid-gestation (especially as of the day that this settlement agreement was actually reached).

"This case is complicated by the fact that the settlement includes Shell's promise to comply with the final abatement order from the [Water Board]. Shell's [designated person most knowledgeable deponent, William Platt] put the anticipated cost of compliance with the anticipated [Water Board] order at $146M. While hard to quantify in value terms, this should be seen by any rational individual plaintiff or by the City of Carson as a promise of overwhelming value since it solves the root cause of the tort claims even though it cannot magically eliminate the tort plaintiffs' accumulated claims

13

for past damage to real estate and personal injury.  The fact that it is hard to quantify does not, however, make it worthless.

"Given the amount of the $90M cash settlement (over $60,000 per plaintiff on a straight pro rata basis, but still subject to Justice Panelli's actual allocation process), combined with the hard-to-value promise to abate the underlying problem to the satisfaction of the relevant state government agency charged with responsibility for this exact type of problem, it is hard to find this inadequate or collusive.  The Court is therefore satisfied that moving parties have made a sufficient showing to put any objecting party to its/their burden to show that the settlement is not made in good faith.  Simply put, the combination of the $90M hard cash settlement promise and the harder-to-value promise to abate per [Water Board] direction is a large enough payment of consideration by Shell and its affiliates as to be 'within the ballpark' for purposes of *Tech-Bilt* . . . .

"Plaintiffs and their very experienced trial counsel have tried to make this case look as valuable as possible but they lack any persuasive showing at this time that there are clusters of cancer or other diseases plausibly associated with the in-ground petrochemical pollution at issue here.  While the [Water Board] has issued cautionary messages to the residents of the housing tract to limit their exposure to their own yards, the [Water Board] is obviously well informed of the conditions in  the area, and it has not directed to the Court's knowledge that even one of the many homes should be temporarily or permanently vacated.  Politely put, plaintiffs have done an excellent job in maximizing the potential value of their claims . . . but these inflated numbers tell an experienced judge very little about the actual value of the [personal injury] case.  Simply put there is more that is unknown about the ultimate value of these claims as compared to what is known.  Under the circumstances, the burden of proof on a motion like this makes it susceptible of ready resolution since the inability to make a persuasive showing due to the underlying uncertainty of the available information burdens the opposing party, not the moving party.

14

"Having found that the Moving Parties have fulfilled the *Tech-Bilt* factors and that Developer Defendants have failed to carry their burden of proof and persuasion, the motion [is] granted."

7. *Writ proceedings*.

Developer Defendants filed a petition for writ of mandate, challenging the trial court's approval of the good faith settlement on the ground it failed to "monetize" the value of the RAP and failed to allocate the consideration among the 1,491 individual plaintiffs and between their economic and non-economic damages.

This court summarily denied the petition. Developer Defendants filed a petition for review. The Supreme Court granted the petition for review and transferred the matter back to this court with directions to vacate its order denying mandate and to issue an order to show cause. We issued an order to show cause and set the matter for hearing.

## CONTENTIONS

Developer Defendants contend: the trial court erred in failing to assign a dollar value to Shell's contractual commitment to remediate the Carousel tract; the trial court further erred in finding good faith in the absence of an allocation of the settlement consideration among the 1,491 individual Plaintiffs and their alleged economic and noneconomic damages; and the trial court's failure to calculate Developer Defendants' offset was legally erroneous.

## DISCUSSION

1. *General principles with respect to determination of good faith settlement*.

Section 877 "establishes that a good faith settlement bars other defendants from seeking contribution from the settling defendant (§ 877, subd. (b)), but at the same time provides that the plaintiff's claims against the other defendants are to be reduced by 'the amount of consideration paid for' the settlement (§ 877, subd. (a))." (*Abbott Ford*, *supra*, 43 Cal.3d at p. 873.)

The factors to be taken into account in the determination of whether a settlement is in "good faith" include: a rough approximation of plaintiff's total recovery and the

settlor's proportionate liability, the amount paid in settlement, the allocation of settlement proceeds among plaintiffs, and a recognition that a settlor should pay less in settlement than if found liable after a trial. (*Tech-Bilt*, *supra*, 38 Cal.3d at p. 499.) Other relevant considerations include the financial conditions and insurance policy limits of settling defendants, as well as the existence of collusion, fraud, or tortious conduct aimed at injuring the interests of nonsettling defendants. (*Ibid.*) The *Tech-Bilt* factors are nonexhaustive and "may not apply in all cases." (*PacifiCare of California v. Bright Medical Associates, Inc.* (2011) 198 Cal.App.4th 1451, 1464.) Further, practical considerations obviously require that the evaluation be made on the basis of information available at the time of settlement. (*Tech-Bilt*, *supra*, at p. 499.) " '[A] defendant's settlement figure must not be grossly disproportionate to what a reasonable person, at the time of the settlement, would estimate the settling defendant's liability to be.' [Citation.]" (*Ibid.*)

The determination as to whether a settlement is in good faith is a matter left to the discretion of the trial court (*Tech-Bilt*, *supra*, 38 Cal.3d at p. 502; *Mattco Forge, Inc. v. Arthur Young & Co.* (1995) 38 Cal.App.4th 1337, 1349 (*Mattco Forge*)), with the party asserting the lack of good faith having the burden of proof on that issue. (§ 877.6, subd. (d); *Tech-Bilt*, *supra*, at p. 499; *Mattco Forge*, *supra*, at p. 1350, fn. 6.) "On appellate review, a trial court's determination of good faith of a settlement involving the resolution of factual issues will be upheld if supported by substantial evidence. [Citation.]" (*Erreca's v. Superior Court* (1993) 19 Cal.App.4th 1475, 1490 (*Erreca's*).)[11]

---

[11] We are mindful that "any factual findings or determinations made on contested issues of liability or damages are tentative and solely for the purposes of evaluating the good faith of a proposed settlement as of the date of such evaluation. [¶] On writ review, our determination is similarly circumscribed. It is limited solely to the question of the trial court's abuse of discretion in ruling on the good faith motion. As must the trial court, we rely upon the state of the record, and the respective showings made by the parties, as of the time of the motion." (*Toyota Motor Sales U.S.A., Inc. v. Superior Court* (1990) 220 Cal.App.3d 864, 878, fn. 9, italics omitted.)

16

2. *No merit to Developer Defendants' contention the trial court should have assigned a specific value to the RAP remediation; because Shell already was obligated to comply with the RAP, the remediation thereunder was not part of the settlement consideration and should not be included in the settlement valuation.*

a. *The question of whether Shell's cost to implement the RAP should be included in the settlement consideration is properly before this court.*

Developer Defendants' theory is that in ruling on the motion for good faith settlement, the trial court was required to assign a dollar value to Shell's implementation of the RAP, in addition to the $90 million cash settlement, in order to determine the proper amount of the offset to which the nonsettling parties would be entitled. This raises, as a threshold question, whether Shell's cost of complying with the RAP should be included at all in evaluating the good faith settlements.

As indicated, the trial court approved the settlements as being in good faith without assigning a specific value to the RAP. It simply found "the combination of the $90M hard cash settlement promise and the harder-to-value promise to abate per [the Water Board's] direction is a large enough payment of consideration by Shell . . . as to be 'within the ballpark.' "

In their returns to the petition, Plaintiffs, Carson and Shell take the position that the remediation is not part of the consideration paid by Shell in settlement and therefore Developer Defendants are not entitled to a valuation or an offset *in any amount* for Shell's cost of remediation.

In their reply, Developer Defendants assert that because Plaintiffs, Carson and Shell did not seek review by way of a writ petition of their own, they waived their right to attack the trial court's findings that the good faith settlements included a promise by Shell to comply with the RAP and that Shell's promise was of great value because it solved the root cause of the tort claims. Developer Defendants' argument that real parties waived the issue is meritless. The settling parties were not aggrieved by the trial court's decision approving the good faith settlements. (See Code Civ. Proc. § 902; *In re Marriage of*

17

*Burwell* (2013) 221 Cal.App.4th 1, 13 [only aggrieved party may appeal].) The settling parties were not required to file a writ petition simply to challenge the *reasons* the trial court gave for approving the good faith settlements.

Accordingly, we reject Developer Defendants' argument that this court cannot address the threshold issue of whether the RAP remediation was part of the settlement consideration. Indeed, Developer Defendants' petition for writ of mandate squarely presents the issue, by arguing that "*all elements of consideration*" must be assigned a dollar value at the time of the good faith hearing. This contention is sufficient to raise the issue of whether the RAP remediation constituted part of the settlement consideration. Further, the question of whether the RAP remediation was part of the settlement consideration has been extensively briefed by the parties. We therefore proceed to address the merits of the issue.

b. *Shell's compliance with the RAP, already mandated by the Water Board pursuant to the state's police powers, was not part of the settlement consideration, and therefore could not be weighed by the trial court as part of the amount paid in settlement.*

It is hornbook law that "[d]oing or promising to do what one already is legally bound to do cannot be consideration for a promise." (*Asmus v. Pacific Bell* (2000) 23 Cal.4th 1, 32 (dis. opn. of George, C. J.) (*Asmus*); accord, *Garcia v. World Savings, FSB* (2010) 183 Cal.App.4th 1031, 1040; 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 218, p. 251; see also Civ. Code § 1605 [defining good consideration as "[a]ny benefit conferred, or agreed to be conferred, upon the promisor, by any other person, to which the promisor is not lawfully entitled, or any prejudice suffered, or agreed to be suffered, by such person, other than such as he is at the time of consent lawfully bound to suffer, as an inducement to the promisor"].)

Shell's performance of environmental remediation at the site of the former Kast Tank Farm is not pursuant to its settlements with Plaintiffs and Carson, and is not contingent on the fate of any good faith settlement motion. Rather, the remediation already was mandated by the Water Board in March 2011, pursuant to Water Code

18

section 13304, well before Plaintiffs, Carson and Shell reached settlements in this litigation.[12] The cleanup and abatement order was based on Shell's "ownership of the former Kast Property Tank Farm" and its "former operation of a petroleum hydrocarbon tank farm at the Site." The Water Board directed Shell to clean up the waste and abate the effects of the discharge, and ordered Shell to prepare a full-scale impacted soil remedial action plan for the site. The cleanup and abatement order specified: "All obligations are imposed *pursuant to the police powers of the State of California* intended to protect the public health, safety, welfare, and environment." (Italics added.)

Thus, Shell is under a preexisting obligation, imposed by the Water Board pursuant to the state's police powers, to remediate the site. It follows that Shell's compliance with the Water Board's cleanup and abatement order is not part of the amount paid in settlement. Therefore, there is no merit to Developer Defendants' contention that in ruling on the motion for good faith settlement, the trial court should have included the value of the RAP (the cost of which has been estimated at $146 million) to determine the proper amount of the offset to which the nonsettling defendants will be entitled.

Further, because Shell's remediation in compliance with the RAP is not part of the consideration it paid in settlement, there is no merit to Developer Defendants' contention

---

[12]    Water Code section 13304 states in relevant part at subdivision (a): "A person who has discharged or discharges waste into the waters of this state in violation of any waste discharge requirement or other order or prohibition issued by a regional board or the state board, or who has caused or permitted, causes or permits, or threatens to cause or permit any waste to be discharged or deposited where it is, or probably will be, discharged into the waters of the state and creates, or threatens to create, a condition of pollution or nuisance, *shall, upon order of the regional board, clean up the waste or abate the effects of the waste*, or, in the case of threatened pollution or nuisance, take other necessary remedial action, including, but not limited to, overseeing cleanup and abatement efforts. . . . Upon failure of a person to comply with the cleanup or abatement order, the Attorney General, at the request of the board, shall petition the superior court for that county for the issuance of an injunction requiring the person to comply with the order. In the suit, the court shall have jurisdiction to grant a prohibitory or mandatory injunction, either preliminary or permanent, as the facts may warrant." (Italics added.)

19

that the settling parties' exclusion of the cost of the RAP from the settlements was collusive and intended to minimize the amount that would be set off against the nonsettling parties' liability.

> c. *To the extent the trial court gave weight to the value of the RAP in approving the good faith settlements, the error was harmless; on the record presented, the $90 million payment by Shell, standing alone, is well within the range of Shell's proportionate liability*.

Although the trial court erred to the extent that it relied on Shell's remediation of the site, *in addition to* the $90 million cash settlement, to find "a large enough payment of consideration by Shell . . . as to be 'within the ballpark,' " on the record presented the error was harmless because the $90 million, in and of itself, is well within the "ballpark."

> (1) *The* Acosta *settlement*.

The damages asserted by Plaintiffs do not drive our analysis. A plaintiff's *claims for damages* are not determinative – rather, the court is called upon "to make a 'rough approximation' of what the plaintiff would actually recover." (*West, supra,* 27 Cal.App.4th at p. 1636.)

Based on our review of the record, the $90 million *Acosta* settlement, amounting to over $60,000 per plaintiff, was well within the range of Shell's liability for Plaintiffs' damages, particularly given the earlier disposition of Plaintiffs' property damage claims against Shell. As indicated, the trial court previously had granted Shell's motion to strike Plaintiffs' claims for property damage on statute of limitations grounds. As noted in footnote 7, above, the parties disagree as to whether the trial court's order eliminated *all* property damage claims against Shell, or whether Plaintiffs' claims against Shell for continuing nuisance and continuing trespass survived that ruling. At the hearing on the motion for good faith settlement, the trial court stated "Shell is out on the property damages; Shell is in on personal injury," and then added, "[*t*]*here may be some more*, but the heart of it is . . . personal injury." (Italics added.) Assuming arguendo that Plaintiffs' causes of action against Shell for continuing nuisance and continuing trespass remained

20

intact after the ruling on the motion to strike, the trial court reasonably could conclude that Shell's remediation of the Carousel tract, pursuant to the RAP, largely moots those claims, making this essentially a personal injury action as against Shell. In other words, although the RAP was not part of the amount *paid* by Shell in settlement, the impact of the remediation need not be ignored in determining the good faith of the settlements.

Turning to the adequacy of the consideration given by Shell, on the record presented, the $90 million payment to Plaintiffs is not " 'grossly disproportionate to what a reasonable person, at the time of the settlement, would estimate the settling defendant's liability to be.' " (*Tech-Bilt*, *supra*, 38 Cal.3d at p. 499.)

The Miller declaration, filed in support of Shell's motion for good faith settlement, demonstrated the difficulty Plaintiffs would have in proving causation and in prevailing on their personal injury claims. The pool of test plaintiffs showed there were no clusters of disease among them, most of whom claimed a variety of common illnesses and ailments such as asthma, allergies, headaches, diabetes, heart conditions and high blood pressure, with the causal connection between those diagnoses and environmental conditions in the Carousel neighborhood appearing to be questionable. One of the test plaintiffs was a 79 year old man who asserted a claim for prostate cancer, but medical literature shows that prostate cancer at that age is ubiquitous. Another test plaintiff decedent allegedly died of stomach cancer, but that allegation was inconsistent with her medical records. Thus, at the time of settlement, as Shell has argued, evidence of a causal connection between Plaintiffs' diagnoses and environmental conditions in the Carousel neighborhood was "tenuous at best." *Tech-Bilt* teaches that "practical considerations obviously require that the evaluation be made on the basis of information available at the time of settlement." (*Tech-Bilt*, *supra*, 38 Cal.3d at p. 499.) Given the slight evidence of injuries stemming from the environmental contamination, the compensation of over $60,000 per plaintiff on a pro rata basis appears to be well within the proverbial ballpark.

21

As for Shell's proportionate liability, vis-à-vis Developer Defendants, we begin with the premise that "a settlor should pay less in settlement than he would if he were found liable after a trial." (*Tech-Bilt*, *supra*, 38 Cal.3d at p. 499.) Shell's moving papers below presented evidence that Barclay sought permission from Shell in 1965, prior to the close of sale, to conduct "site clearing work" on the property. The Barclay letter stated, "We would like to begin immediately to remove the liquid waste and petroleum residues from the property." The evidence also included a March 1966 letter from a soils engineer to the original developers, indicating the soil beneath one of the reservoirs at the Kast site was "highly oil stained," and that the soils had a "petroleum odor." Thus, there is substantial evidence to show the original developers were aware of the contamination at the site, and that it was the original developers who undertook to remove the liquid waste and petroleum residues to prepare the site for home development. Given this showing that substantial liability should be allocated to Developer Defendants, Shell's payment of over $60,000 on a pro rata basis for its share of Plaintiffs' purported personal injuries does not appear to be " 'grossly disproportionate to what a reasonable person, at the time of the settlement, would estimate [Shell's] liability to be.' " (*Tech-Bilt*, *supra*, 38 Cal.3d at p. 499.)

(2) *The* Carson *settlement*.

Turning to the *Carson* settlement, which provided for mutual releases and a waiver of costs, Developer Defendants characterize it as a "walk away" by Shell, which gives Carson nothing of substance if the RAP remediation cost is excluded. However, Developer Defendants' argument disregards the nature of the relief which Carson sought in this litigation. Carson's complaint did not seek monetary damages; rather, it requested "full and total abatement of the contamination down to approximately 40 feet below the Carousel neighborhood."

The RAP will achieve abatement, albeit not to the depth originally sought by Carson. Pursuant to the Water Board's order, Shell will excavate to a depth of five to ten feet beneath the homes, following excavation will install a vapor extraction and venting

22

mechanism, and will institute comprehensive long-term monitoring. Developer Defendants admit in their petition that "[t]hrough its promise to remediate down to depths of 5 to 10 feet, *Shell is substantially providing the relief that Carson sought*." (Italics added.) That being the case, it would appear that Shell did not need to provide any additional consideration in its good faith settlement with Carson. Because the RAP remediation basically moots the claims pled by Carson, the trial court did not err in approving the good faith settlement in the *Carson* action.

3. *Good faith settlement determination did not require an allocation of the $90 million settlement fund among the 1,491 individual Plaintiffs and between their economic and noneconomic damages; individualized allocations would require 1,491 mini-trials at the good faith settlement stage, an approach which the Supreme Court has cautioned against.*

Developer Defendants contend the trial court erred in finding good faith without an allocation of the entire settlement consideration among the 1,491 individual Plaintiffs and between their economic and noneconomic damages. Our conclusion that the estimated $146 million cost of complying with the RAP is not part of the settlement consideration makes it unnecessary to address Developer Defendants' arguments with respect to the calculation and allocation of an offset for the RAP remediation costs. Therefore, we confine our analysis to the allocation of the $90 million monetary payment among Plaintiffs. For the reasons discussed below, we reject Developer Defendants' allocation arguments.

a. *Case law does not support Developer Defendants' assertion that individualized allocations were required to be made at the time of the good faith determination*.

Developer Defendants contend that two decisions, *Knox v. County of Los Angeles* (*Knox*) (1980) 109 Cal.App.3d 825, and *Alcal Roofing & Insulation v. Superior Court* (1992) 8 Cal.App.4th 1121 (*Alcal*), "control the analysis here," so as to require an

23

allocation among the individualized claims at the time of the good faith determination. It appears to this court that Developer Defendants' reliance on *Knox* and *Alcal* is misplaced.

In *Knox*, three plaintiffs sued a market and three of its employees (the market defendants) as well as three governmental defendants, for unlawful arrest and other causes of action, arising out of a single incident in which the plaintiffs were arrested by sheriff's deputies for allegedly violating a temporary restraining order regulating picketing. (*Knox*, *supra*, 109 Cal.App.3d at pp. 828-829.) The plaintiffs reached a pretrial settlement with the market defendants amounting to $4,000 per plaintiff, for a total of $12,000. (*Id*. at pp. 829-830.) At trial, the governmental defendants were found liable for a total of $52,500 in damages. (*Id*. at pp. 830-831.) Following trial, the court denied the governmental defendants' request for a $12,000 offset for the amount the three plaintiffs received in settlement from the market defendants. (*Id*. at p. 831.)

The reviewing court reversed and remanded for further proceedings to determine the amount of the offset to which the governmental defendants were entitled. (*Knox*, *supra*, 109 Cal.App.3d at p. 837.) It explained, "the [lower] court should have required an evidentiary showing by plaintiffs establishing and justifying an agreed allocation of less than all of the $4,000 settlement figure to the first and second causes of action [for unlawful arrest and false imprisonment in which the market defendants were alleged to be joint tortfeasors with the governmental defendants]. Had such an allocation been shown, its effectiveness would depend upon finding it to be a good faith allocation. The statutory requirement of good faith extends not only to the amount of the overall settlement but as well to *any allocation which operates to exclude any portion of the settlement from the setoff*. [Citations.] It is apparent, therefore, that an evidentiary hearing is required to establish a factual basis, if any there is, for denying [the governmental defendants] credit for the full amount of the settlement." (*Id.* at pp. 836-837, italics added.)

Clearly, *Knox* does not stand for the proposition that the allocation must be made *at the time of the good faith settlement determination*. Rather, as stated in the *Erreca's*

decision, *Knox* held, "Where the settling parties have agreed to allocate less than all of the settlement amount to a portion of the causes of action, an evidentiary showing is required to justify such allocation. (*Knox v. County of Los Angeles* (1980) 109 Cal.App.3d 825, 836-837.)" (*Erreca's*, *supra*, 19 Cal.App.4th at p. 1491.)

The concern expressed in *Knox* about an "allocation which operates to exclude any portion of the settlement from the setoff" (*Knox*, *supra*, 109 Cal.App.3d at p. 837) is not present here. In the instant case, the $90 million settlement was entirely unallocated. Therefore, in ruling on the motion for good faith settlement, the trial court was not called upon to scrutinize an allocation which excluded some portion of the settlement from the setoff.

*Alcal*, the other case on which Developer Defendants heavily rely, also involved a settlement allocation which excluded a portion of the settlement from the setoff. In *Alcal*, a roofer, the sole nonsettling defendant in a multiparty construction defect action, challenged the trial court's approval of a $4.4 million settlement pursuant to section 877.6. The roofer did not object to the amount of the settlement, but challenged the settling parties' allocation of only $100,000 of the settlement to roofing issues. This allocation left the roofer vulnerable to remaining damages that could reach $2 million, with an offset of only $100,000 from the settlement. (*Alcal*, *supra*, 8 Cal.App.4th at pp. 1122-1123.)

*Alcal* agreed with the roofer that the lower court erred in approving the settlement. (*Alcal*, *supra*, 8 Cal.App.4th at p. 1123.) It explained: "We cannot determine from the documents before us what settlement or settlements took place and what parties agreed to what allocations." (*Id.* at p. 1128.) The settling parties "la[id] blame on roofer for failing to present convincing evidence that $100,000 was an improper joint allocation to roofing issues. We conclude, however, that roofer's burden to show an improper allocation did not arise during the proceedings below because the settling parties failed to present to roofer and the court a clear and complete description of the settlement or settlements. *At a minimum, a party seeking confirmation of a settlement must explain* to the court and to

25

all other parties: who has settled with whom, the dollar amount of each settlement, *if any settlement is allocated, how it is allocated between issues and/or parties*, what nonmonetary consideration has been included, and how the parties to the settlement value the nonmonetary consideration. [¶] Because we cannot determine (1) what settlement or settlements the court approved, (2) when and in what way the subcontractors settled and joined in the allocation, and (3) the value of the assigned rights, we cannot allow the court's order to stand." (*Id*. at p. 1129, italics added.)

To reiterate, in the instant case, no portion of the $90 million was allocated and excluded from the setoff. Therefore, the concern present in *Alcal*, where only a fraction of the settlement was allocated to roofing issues to the detriment of the nonsettling roofer, has no application here. (See, also, *Erreca's*, *supra*, 19 Cal.App.4th at p. 1491 [by allocating only $1.5 million of total settlement to soils issues, parties reduced amount of setoff available to soils defendants].)

Here, the full $90 million is theoretically available as a setoff to the nonsettling Developer Defendants. Because no portion of the settlement fund was excluded from the setoff, the allocation issue is simply the distribution of the $90 million among the 1,491 Plaintiffs, and between their economic and noneconomic damages. Hypothetically, Justice Panelli may award one plaintiff $30,000 and may award a neighboring plaintiff $120,000. However, how much each of the Plaintiffs will receive in settlement, and what each one's ratio of economic and noneconomic damages will be, appears to have slight bearing on whether the $90 million settlement, in the aggregate, is fair to Developer Defendants.

b. *Approval of the $90 million good faith settlement did not require individualized allocations among the 1,491 Plaintiffs and between their economic and noneconomic damages.*

Developer Defendants contend the trial court erred in finding good faith "in the absence of an allocation of the settlement consideration among the 1,491 individual Plaintiffs and their alleged economic and noneconomic damages," and in the absence of

an allocation by the settling parties, the trial court was required to allocate the settlement proceeds in the manner most favorable to the nonsettling defendants. The allocation issue is of concern to nonsettling defendants because Civil Code "[s]ection 1431.2 provides that the responsibility for the noneconomic portion of the damages allocated to each defendant shall be several and not joint. Therefore, each defendant is solely responsible for his or her share of the noneconomic damages. Thus, that portion of the settlement attributable to noneconomic damages is not subject to set-off." (*Espinoza*, *supra*, 9 Cal.App.4th at p. 276.)

The trial court ruled the lack of an allocation of the $90 million settlement proceeds did not require it to deny the motion for good faith settlement; instead, the allocation could be determined at a later date -- after each trial, the court would allocate that plaintiff's settlement proceeds by applying the jury's ratio of economic to noneconomic damages. The trial court gave the following illustration: if Justice Panelli were to award $50,000 to lead plaintiff Adelino Acosta, and the jury later were to determine that Mr. Acosta's damages against Developer Defendants were two-thirds noneconomic, then two-thirds of his $50,000 Shell settlement would be deemed noneconomic and not available to Developer Defendants as an offset.

The trial court's ruling was entirely consistent with *Espinoza*, *supra*, 9 Cal.App.4th at pages 276-277, which, as the Supreme Court recently noted in *Rashidi v. Moser* (2014) 60 Cal.4th 718 (*Rashidi*), provides a "widely accepted method" for making a postverdict allocation. (*Id*. at p. 722.) "The percentage of the jury's award attributable to economic damages is calculated and applied to the settlement, yielding the amount that the nonsettling defendant is entitled to offset. [Citations.]" (*Rashidi*, *supra*, at p. 722.)

We note the concluding footnote in *Espinoza* states: "We do not here reach the issue of whether a trial court presiding over a good faith settlement hearing should make any such allocation *if it is requested to do so*." (*Espinoza*, *supra*, 9 Cal.App.4th at p. 277, fn. 9, italics added.) [13]

The question left open by *Espinoza* is presented here. Our analysis is informed by the Supreme Court's seminal decisions in *Tech-Bilt* and *Abbott Ford*. In *Tech-Bilt*, the court adopted the "ballpark" rule, which is "an attempt to make only a 'rough approximation of plaintiffs' total recovery and the settlor's proportionate liability' modified by several considerations." (*Abbott Ford*, *supra*, 43 Cal.3d at pp. 887-888, conc. opn. of Broussard, J., citing *Tech-Bilt*, *supra*, 38 Cal.3d at p. 499.) *Tech-Bilt* was concerned that an alternative approach "*would tend to convert the pretrial settlement approval procedure into a full-scale minitrial . . . .*" (*Tech Bilt*, *supra*, at p. 499, italics added.) *Abbott Ford* reiterated that concern, stating "the fact a nonsettling defendant may challenge the agreement's assigned value *should not be interpreted as giving such defendant a right to a mini-trial on the valuation issue*. The nature, extent and the procedure regarding any such challenge is left to the discretion of the trial court." (*Abbott Ford*, *supra*, at p. 880, fn. 23, italics added.)

Under Developer Defendants' theory, the trial court would have had to conduct 1,491 mini-trials to scrutinize or determine any individualized allocations of the $90 million settlement fund. Developer Defendants' argument is not tenable in light of the cautionary language found in *Tech-Bilt* and *Abbott Ford*. Moreover, an approach requiring individualized allocations of the settlement fund at the good faith settlement stage would severely impede good faith settlements in multi-plaintiff cases of this complexity.[14]

---

[13] Apparently, in the years since *Espinoza*, the issue has remained unresolved. (See Haning, Flahavan, Cheng & Wright, California Practice Guide: Personal Injury (The Rutter Group 2015) para. 4:185.23.)

[14] It is unnecessary to address any remaining arguments raised by the petition.

28

**DISPOSITION**

The order to show cause is discharged.  The stay of proceedings previously ordered by this court is lifted upon finality of this opinion.  The petition for writ of mandate is denied.  Real parties in interest shall recover their costs in this proceeding. (Cal. Rules of Court, rule 8.493.)

**CERTIFIED FOR PUBLICATION**


EDMON, P. J.

We concur:


LAVIN, J.


JONES, J.[*]

---

[*]  Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.