GOODMAN, J.**
*484 Appellant Barclay Hollander Corporation (Barclay) seeks reversal of a judgment of the Los Angeles Superior Court denying its Petition for Writ of Mandate by which it sought to overturn the determination of the State of California Regional Water Quality Control Board, Los Angeles Region (Water Board) that Barclay is jointly and severally responsible with real party in interest Shell Oil Company (Shell) for the cleanup and abatement of petroleum hydrocarbon compounds and other contaminants (the petroleum residue or waste) at the former Shell tank farm in Carson, California (the Site).
We affirm the trial court's order and judgment upholding the Water Board's determination.
FACTUAL AND PROCEDURAL BACKGROUND
Barclay is a wholly owned subsidiary of Dole Food Company, Inc. In Dole Food Co., Inc. v. Superior Court (2015) 242 Cal.App.4th 894, 195 Cal.Rptr.3d 461 ( Dole ), we considered and resolved issues related to the good faith *485 settlement of a class action brought by owners of homes constructed on the Site, the same area that is the subject of the Water Board's revised *209 Cleanup and Abatement Order (RCAO) in this case.
In our opinion in Dole , we described that earlier litigation, in relevant part, as follows. "Between the 1920's and the early 1960's, Shell owned and operated three crude oil storage reservoirs, known as the Kast Tank Farm, at the site which later was developed as the Carousel tract. It is alleged that at least one of the storage tanks was leaking its contents into the soil, causing the site to become contaminated with toxic substances. [¶] In October 1965, Shell entered into an agreement to sell the land to Richard Barclay and his associates (Barclay), a group of residential developers that intended to convert the property into a residential subdivision. Shell transferred title to the property in October 1966. In preparation for the change in use, the oil storage reservoirs were decommissioned, the reservoir walls were torn down and buried on site, and the land was graded for home construction. The land was rezoned from industrial to residential, and the Carousel homes were constructed and sold by the early 1970's.
"....
"In 2008, after discovering contamination nearby, the Water Board directed Shell to conduct environmental testing at the Carousel tract. These investigations revealed the presence of petroleum hydrocarbons in the areas where Shell's former oil reservoirs had been located. In March 2011, the Water Board issued a cleanup and abatement order to Shell, directing it to submit a proposed remediation plan. This order was based on Shell's 'ownership of the former Kast Property Tank Farm' and its 'former operation of a petroleum hydrocarbon tank farm at the Site.'
"After submitting an initial RAP[1 ] that was rejected, Shell submitted a revised RAP in June 2014, with an addendum in October 2014. Under the revised RAP, Shell will, inter alia, excavate five to 10 feet beneath the homes, following excavation will install a vapor extraction and venting mechanism, and will institute comprehensive long-term monitoring. In addition, Shell will provide temporary relocation assistance in connection with implementing the RAP, and will compensate Carousel homeowners to ensure they receive fair market value if they elect to sell their homes. [¶] Shell's corporate representative, William Platt, has estimated it will cost Shell $146 million to implement the RAP." ( Dole, supra , 242 Cal.App.4th at pp. 899-900, 195 Cal.Rptr.3d 461, fns. omitted.)
We made reference there to the addition of Barclay to the RCAO, writing in footnote 6 of our opinion in Dole , "... the Water Board recently adopted *486 the staff's recommendation, thus making Barclay Hollander responsible for contributing to the cost of the board-ordered remediation." ( Dole, supra , 242 Cal.App.4th at p. 900, 195 Cal.Rptr.3d 461.) That order is the subject of the present appeal.
Shell purchased the 44.3-acre Site in 1923. Three storage tanks or reservoirs were situated there; each was constructed with interior concrete liners, its walls supported externally by compacted earth; each reservoir had a wooden top. The total storage capacity of the three reservoirs was 3.5 million barrels of oil. Each reservoir was surrounded by an earthen berm 10 to 15 feet in height. Earthen berms also had been built on the perimeter of the property to retain any overflow of petroleum. The reservoirs were used primarily *210 to store "heavy oils." Beneath the site are preexisting groundwater aquifers used for drinking water.
During Shell's operation of the Kast Tank Farm the reservoirs leaked,[2] releasing petroleum and petroleum residue into the surrounding soil and groundwater.
By 1959, utilization of the tank farm had decreased; thereafter, the three reservoirs were used for "stand-by storage." As of February 1964, the three reservoirs held a total of 425,448 barrels of a mixture of petroleum product and water.[3]
Barclay made an offer to purchase the Site on October 14, 1965. In a visit to the Site a week later, on October 21, 1965, the Barclay representative learned the condition of the Site, including the contents of the three reservoirs. Four days later, Shell wrote to Barclay pursuant to the latter's request, to advise it more specifically of the contents of each reservoir, enclosing 10 drawings concerning the Site.[4] Later that month, Barclay and Shell agreed to the sale of the Site to "Richard Barclay or nominee" conditioned "upon the effective re-zoning of the industrial property to R-1" and approval by the purchaser "of an engineering report to be obtained at [Barclay's] sole cost and expense." Barclay was also aware of the existence of pipes for transfer of petroleum across and beneath the surface of the Site.
In its letter to Shell dated December 1, 1965, Barclay sought permission "to begin immediately to remove the liquid waste and petroleum residues *487 from the property." Barclay "estimate[d] it will take about three months for completion." In the same letter, Barclay wrote that it would be in a position to begin grading the property and restoring it to its "natural grade" in late February or March of 1966.
Shell consented to these requests for early entry and commencement of the intended work subject to certain conditions, including that Barclay "pay all costs and expenses arising out of your work thereon and the disposition of wastes and residues removed" from the property, and that "all work done by or for [the purchaser] on said lands or in disposing of wastes and residues removed ... shall be done in a good, lawful and workmanlike manner." Richard Barclay agreed to these terms on behalf of Barclay.
Later that month, on December 28, 1965, Richard Barclay advised Shell that his nominee to take title to the property was Lomita Development Co. (Lomita), doing so by letter on stationery of Barclay.[5] The closing date for the sale was to be July 1, 1966.
In the early months of 1966, Lomita obtained from Pacific Soils Engineering, Inc. (PSE) several reports on the condition of the soil on the Site and recommendations on how to dispose of the four-foot-thick concrete structures that had been used in the construction of the three reservoirs. In the section of its January 7, 1966 letter to Lomita headed "Present Site Conditions," PSE described the reservoirs and surrounding area as follows: "The existing *211 structures on the subject tract were constructed prior to 1930 and consist of three large oil reservoirs and their attendant berms. The earthen walls of the reservoir[s] are generally about fifteen feet in height and have a slope ratio of 1-1/2:1. The bottom[s] and sides of the reservoir[s] are lined with a four-inch blanket of reinforced concrete. The reservoirs are nearly 30 feet deep and are covered by wooden roofs.... [¶] Earthen berms ranging in height from ten to fifteen feet have been constructed between the reservoirs and around the exterior boundaries of the tract. [¶] Due to the permeability of the surface soils, water tends to pond in the topographically low areas of the tract. An old sump, reported to be only three feet in depth, has been approximately located.... In addition, large underground pipes and conduits are to be found throughout the tract."
PSE recommended that the concrete either be "wasted from the site or buried deep enough in the fill so as not to interfere with further construction." Confirmation that the concrete slabs were buried on the Site appears (a) in the terms and conditions for issuance of the subdivision map for the development approved by the Regional Planning Commission of the County of Los *488 Angeles; those terms included breaking up the concrete and burying the slabs at least seven feet beneath the finished grade; and (b) in a letter from PSE to Lomita, dated January 27, 1966, in which PSE described the method by which it would break up and place the concrete slabs at the appropriate depths before covering them.[6]
In March 1966, PSE reported to Lomita with respect to its testing of the soils at one of the reservoir sites that "the soil[s] beneath the reservoir conform to those found in our original exploration: Generally, the first three feet found directly beneath the [concrete] slab tend to be silty and clayey sands which are highly oil stained. The underlying soils are fine to medium clean sands. All soils are in a dense state and suitable to receive fill. Most of the soils in the borings have a petroleum odor, however the actual amount of oil contained in the soil is unknown." This report was accompanied by an exhibit, denominated "Plate B," dated March 11, 1966, which listed the results of six borings and the condition of the soil in each boring at various depths, reporting that oil and oily smell were present in almost every boring and at almost every depth.
Notwithstanding the December 1, 1965 letter agreement in which Barclay had set out its schedule for cleanup and grading of the Site, an April 1966 internal Shell memorandum indicated that as of that date, Lomita had not completed any phase of its work, explaining that while two of the reservoirs were "empty and clean," oil and water remained in the third. According to this memorandum, the property was not in "a safe condition in [its] present state" with respect to two of the three reservoirs. An August 15, 1966 internal Shell memorandum indicated that by that date all of the "oil" had been removed and the safety hazards had been remediated. This memorandum noted, "This leaves the property so there is almost nothing to burn and no chance of anyone falling in any kind of oil sump or pit."
In September 1966, PSE reported to Lomita on a revision in the method that would be used to bury the concrete slabs, *212 advising that once the slabs were broken up, they should be "thoroughly mixed with soil, watered and compacted with a heavy vibratory roller. Following completion the mixture should be watered thoroughly to insure proper filling of all voids." PSE reported it had tested this method and that "Applying this to [the] entire reservoir bottom, nearly 5,000,000 cu. ft. of water should percolate through the reservoir floor. This indicates that drainage should not be a problem in the development of this parcel." In April 1967, PSE made a similar recommendation for another section of the Site. *489 The transaction had originally been scheduled to close escrow in July 1966; however, various delays resulted in extending the closing date to October 1, 1966. The Grant Deed from Shell to "Lomita Development Co., a partnership" was recorded in the Office of the Los Angeles County Recorder on October 14, 1966.
Thereafter, Lomita sold a few lots in the new subdivision to homeowners before granting the remainder of the Site to "Barclay Hollander Curci, Inc. a California corporation." The remainder of the lots were sold by the successor entity, Barclay Hollander, Inc. (BHI).[7]
In March 2008, the Water Board learned from the California Department of Toxic Substances Control that the soil and groundwater at the Site may be contaminated from discharges of petroleum hydrocarbons. Stating its "concern[ ] with the potential threat to the health of residents from the exposure to petroleum related contaminants," on May 8, 2008, the Water Board ordered Shell, as a former owner and operator of the Site, "to initiate a complete environmental investigation including evaluation of impacts to groundwater and the potential threat to human health and if immediate action is required."[8]
*213 *490 In response to that order, Shell conducted the requested environmental investigation, including collecting analytical data, and compiled technical reports based on 2,400 samples taken at several locations on the Site. The data revealed petroleum hydrocarbon contamination at varying depths at these locations and, inferentially, throughout the Site.
In a June 9, 2010 letter from Shell to the then Interim Executive Officer of the Water Board, Sam Unger (Unger), Shell provided its understanding of the organizational history of Barclay and related entities, including that Barclay was now a wholly owned subsidiary of Dole. Also in that letter, Shell "acknowledge[d] its obligation to address the environmental conditions created by its former operations." Shell "respectfully requests that you also include Barclay Hollander and Dole Foods on any order issued related to remediation of the [Site]." The next month, Shell's attorneys sent the Water Board a 14-page letter accompanied by 35 exhibits in which they documented the bases for Shell's request that Barclay and Dole be added to the Cleanup and Abatement Order (CAO).
On March 11, 2011, the Water Board issued a CAO (No. R4-2011-0046) to Shell, ordering it to clean up and abate the contamination at the Site. The CAO contained the determination that Shell was a discharger as described in Water Code section 13304 and a responsible party for the Site based on its prior ownership of the Site and its former operation there of the petroleum hydrocarbon tank farm. The Water Board's findings included that Shell's "activities at the Site have caused or permitted the discharge of waste resulting in soil, soil vapor, and groundwater pollution, including discharges of waste to the waters of the state, and nuisance."
The CAO ordered Shell to assess, monitor, clean up and abate the effects of the petroleum hydrocarbon compounds and other contaminants at the Site.
The next month, on April 22, 2011, the Water Board notified Barclay's parent, Dole, that information in the files of the Water Board, including information provided by Shell, "suggests that the contamination related to the shallow soil [from 0 to 10 feet below ground surface ... and perhaps deeper] was directly related to the demolition of the petroleum hydrocarbons (crude *491 oil) storage reservoirs and the grading of the [Site], which were performed by, and were the sole responsibility of, [Lomita] and its affiliate(s)." The Water Board ordered Dole to provide all information related to its ownership of the Site and activities there, specifically requesting information regarding the reservoirs and redevelopment of the Site into the Carousel tract neighborhood, and to do so by June 15, 2011.[9]
On September 15, 2011, following an extension of time granted by the Water Board, Dole's attorneys responded to the April 22, 2011 order in a 25-page letter, *214 accompanied by 113 exhibits and a declaration. Dole took the position that there was no legal basis upon which to name it as a discharger based on any activities of Lomita, and because, "In April 1969, a Dole subsidiary, not Dole, acquired the remaining unsold lots.... In any event, whether or not the Dole subsidiary is a discharger, Dole does not become a discharger on the mere basis that it owns a corporation that is an alleged discharger."
On October 31, 2013, Water Board Site Cleanup Program Staff (SCP Staff) proposed adding Barclay as an additional responsible party. Also, on that date, the Water Board issued a draft revised CAO (RCAO) adding Barclay as a responsible party, and offered Dole and Shell, and the public, the opportunity to submit comments and evidence with respect to it. Dole requested an extension of the scheduled response date, advising that "we have experts who will be offering written opinions regarding certain issues presented," also asking for time to respond to comments that may be made to the draft RCAO by others. The Water Board granted Dole's request and a subsequent request for an additional extension of time. Dole's response to the draft RCAO, which it filed on January 21, 2014, consisted of an 82-page brief, a 333-page technical response, expert witness declarations and 359 exhibits; in all, it totaled over 11,000 pages.[10]
On June 3, 2014, the Water Board gave notice it would accept additional public comments on the proposed RCAO.[11]
Shell filed its comments addressing Dole's January 2014 submission on June 16, 2014, to which Dole responded on June 30, 2014, with a letter, a witness declaration and additional expert witness declarations, totaling 800 pages.
*492 On December 8, 2014, Unger, now the Executive Officer of the Water Board, issued a memorandum advising that the Water Board was recommending issuance of the RCAO by adding Barclay as a responsible party and discharger. The memorandum contained an extensive discussion of the bases for this recommended determination; it was accompanied by 15 attachments, including SCP Staff's analysis of the issues raised in Dole's letters to the Water Board.
Dole responded to this memorandum on December 24, 2014, for the first time asking the Water Board executive in charge of the matter (Chief Deputy Executive Officer Smith, or Smith) to conduct a formal hearing and to give consideration to what Dole described as "additional critical evidence" that Barclay characterized as previously unavailable.
On January 6, 2015, Dole filed a 19-page letter by which it submitted multiple additional expert reports as well as other materials it sought to have the Water Board consider before issuing a revised order adding Barclay as a discharger and responsible party. The next day, counsel for Shell submitted a letter in response to Dole's December 24, 2014 letter in which Shell argued there was substantial evidence to add Dole and Barclay as responsible parties. Shell also observed that Dole was in error in claiming in its December 2014 letter that it had not been told earlier *215 that the Water Board was considering naming Barclay in the RCAO, and questioned why counsel for Dole and Barclay were only then making a request for a formal hearing.
On January 9, 2015, the Water Board issued a notice to "All Parties and Interested Persons" advising that it was considering the requests and offering the opportunity to comment on the December and January submissions by Dole and Shell, setting the deadline for receipt of such comments at January 16, 2015.
On January 15, 2015, SCP Staff advised that it had no opinion on whether a formal, oral hearing should be held; also writing that the request for such a hearing "is surprising given that Barclay has known since at least October 31, 2013, that SCP Staff was considering adding Barclay and other parties to the CAO." SCP Staff stated its objection to the request to submit additional evidence because "Barclay has had many opportunities to do so and was provided extensions of time to allow an adequate opportunity to respond." SCP Staff also stated its disagreement with the factual claims in other recent submissions by Dole.
In its January 16, 2015 filing, Dole argued its additional evidence should be admitted, now citing the "California Administrative Procedure Act ('APA')
*493 provisions, and State Water Resources Control Board ('State Board') regulations" as the bases for its request for an oral hearing.[12]
On February 27, 2015, the Water Board resolved Barclay's requests to submit additional evidence, ruling that it would not add to the record evidence that was previously available and which could have been submitted during the prior notice and comment periods; it would, however, accept the transcript of deposition testimony of George Bach (Bach), the engineer who had supervised Lomita's work on the Site.
The Water Board also denied Barclay's request to schedule a formal evidentiary hearing, ruling that multiple opportunities had been offered for anyone interested to submit written testimony and evidence and that Dole and Barclay had "utilized these opportunities and submitted more than 1,000 [sic , 11,000] pages of documentary evidence. The factual questions raised by the Draft [RCAO] are primarily technical and therefore, fit to be addressed through written expert reports and rebuttal." After stating additional reasons why the recently made request for formal hearing was inappropriate, the Water Board concluded, "In light of the particular factual, legal and policy questions that are raised, the Board has determined that the issues are adequately and thoroughly addressed through the submitted written evidence and testimony, that [Dole and Barclay have] been provided the opportunity for fair consideration of [their] claims, and the burden and cost of an oral hearing is not warranted in this instance." The parties were nevertheless offered the opportunity to comment on the Bach deposition transcript which the Water Board had agreed to admit.[13]
On April 2, 2015, counsel for Dole and Barclay provided written comments on the Bach deposition, also urging that an earlier unsworn statement Bach had made be disregarded. Also on that date, counsel for Shell submitted a letter in which it argued that the Bach deposition merely confirmed *216 information already stated by him. SCP Staff wrote on the same day that, in its view, the Bach deposition did not alter Staff's conclusion that Barclay should be added to the CAO as a responsible party.
On April 17, 2015, the Water Board issued notice that action on the draft RCAO could be expected on or shortly after April 24, 2015. Counsel for Dole and Barclay wrote to Smith on April 22, acknowledging receipt of the April 17 notice and asking that the Water Board defer any ruling until after certain *494 depositions had been taken in the Acosta civil action.[14] On April 30, 2015, the Water Board explained why it considered it inappropriate to further defer completing action on the proposed addition of a responsible party to the CAO, also advising counsel for Dole and Barclay, and counsel for Shell, that the Water Board was that day issuing the RCAO adding Barclay as a discharger and as a responsible party with respect to the Site. This letter stated in part:
"The modifications to the Draft Revised CAO include a finding by the Regional Board that [Barclay's] activities at the Site not only violated Health and Safety Code section 5411, but also violated Fish and Game Code section 5650 and Los Angeles County Code section 20.36.010.1.... Barclay's activities in breaking up concrete reservoirs, ripping the reservoir floors, and moving soil at the Site permitted petroleum and related products to pass into, or [be] placed where it could pass into, waters of the State. The activities also discharged and deposited, and allowed the continued existence of a deposit of, petroleum hydrocarbons that created a public nuisance, a menace to the public health and safety, pollution of underground waters, and damage to private property."
The letter gave notice that anyone aggrieved by the Water Board's action could petition the State Water Resources Control Board (State Board) to review the action within 30 days.
Among the findings of the 41-page RCAO were the following:
"11. Pollution of Waters of the State: The Discharger has caused or permitted waste to be discharged or deposited where it is, or probably will be, discharged into the waters of the state and creates, or threatens to create, a condition of pollution or nuisance. As described in this Order and the record of the Regional Board, the Discharger owned and/or operated the site in a manner that resulted in the discharges of waste. The constituents found at the site as described in Finding 8 constitute 'waste' as defined in Water Code section 13050(d). The discharge of waste has resulted in pollution, as defined in Water Code section 13050(l ). The concentration of waste constituents in soil and groundwater exceed water quality objectives contained in the Water Quality Control Plan for the Los Angeles Region (Basin Plan), including state-promulgated maximum contaminant levels. The presence of waste at the Site constitutes a 'nuisance' as defined in Water Code section 13050(m). The waste is present at concentrations and locations that 'is injurious to health, or is indecent, or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property ... and [a]ffects at the same time an entire community or *495 neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal. ' *217 "....
"13. Substantial evidence indicates that the Discharger caused or permitted waste to be discharged into waters of [the] state and is therefore appropriately named as a responsible party in this Order. Shell owned and operated the Site, then sold the property to the developers, leaving in place three reservoirs and residual petroleum hydrocarbons in at least one tank and in soil underneath and surrounding the reservoirs. The residual petroleum hydrocarbons are still present at the Site and continue to cause pollution and nuisance as documented in this Order and the Regional Board files. The Regional Board has investigated additional potentially responsible parties (including, but not limited to, Lomita Development Company, Richard Barclay, Barclay-Hollander-Curci, Dole Foods, Inc., Barclay Hollander Corporation and/or any of its successors) and has determined that Lomita, which merged into and was survived by Barclay-Hollander-Curci, renamed [Barclay], caused or permitted the discharge of waste at the Site. Lomita purchased the Site with explicit knowledge of the presence of the petroleum reservoirs and the presence of residual petroleum hydrocarbons, and conducted various activities, including partially dismantling the concrete in the reservoirs and grading the onsite materials. These activities spread the waste at the Site and contributed to the migration of the waste through soil and groundwater. The residual petroleum hydrocarbons are still present at the Site and continue to cause pollution and nuisance as documented in this Order and the Regional Board files. Including [Barclay] as a responsible party in this Order is consistent with orders of the State Water Resources Control Board construing Water Code section 13304 naming former owners who had knowledge of the activities that resulted in the discharge and the legal ability to control the continuing discharge. Including [Barclay] as a responsible party is consistent with Water Code section 13304(j) because Lomita or [Barclay's] actions that resulted in creating pollution and nuisance were unlawful since at least 1949. If the Regional Board becomes aware of any other responsible parties it will consider naming such persons in this Order."[15] (Original italics, fns. omitted.)
On May 21, 2015, counsel for Dole and Barclay notified Smith they intended to challenge the RCAO and asked that its implementation be stayed.
*496 The Water Board denied this request. Barclay's appeal to the State Board was denied by operation of law after that body took no action on it. ( Wat. Code, § 13320, subd. (a) ; Cal. Code Regs., tit. 23, § 2052, subd. (a)(1) ; see Johnson v. State Water Resources Control Bd. (2004) 123 Cal.App.4th 1107, 1112-1113, 20 Cal.Rptr.3d 441 ; People ex rel. Cal. Regional Wat. Control Bd. v. Barry (1987) 194 Cal.App.3d 158, 177.)
Barclay filed its "Verified Petition for Review of Administrative Mandamus ( Code Civ. Proc., § 1094.5 )" on September 30, 2015, which was superseded on March 1, 2016, by the operative "Verified First Amended Petition for Writ of Administrative Mandamus." Following trial on April *218 24, 2017, the superior court denied the petition. Judgment on the petition was entered on June 5, 2017. This timely appeal followed.
CONTENTIONS
Barclay contends: (1) the Water Board failed to hold the type of hearing required by the Administrative Procedure Act ( Gov. Code, §§ 11340 - 11529 ) (APA) and its Administrative Bill of Rights ( Gov. Code, §§ 11425.10 - 11425.60 (Bill of Rights); (2) the payments Shell made to the Water Board constituted a conflict of interest tainting the proceedings and the RCAO; (3) Barclay's actions are protected by the safe harbor of Water Code section 13304, subdivision (j) ; (4) Barclay did not cause or permit a discharge of waste because its actions were not performed with the required knowledge of the hazards created; and (5) the trial court erred in refusing to admit and consider additional evidence proffered by Barclay.[16]
DISCUSSION
I. Introduction
The Porter-Cologne Water Quality Control Act ( Wat. Code, § 13000 et seq. ) (the Porter-Cologne Act), under which the RCAO was issued, revised Water Code provisions addressing both water rights and water quality and expanded the statewide program of water quality control maintained through regional administration within the framework of statewide coordination and policy. For the purposes of the Porter-Cologne Act and of its predecessor, the Dickey Water Pollution Act (former Wat. Code, § 13000 et seq. ) (the Dickey Act), the state is divided into nine regions, each of which is governed by a *497 regional board. ( Wat. Code, §§ 13200, 13201 ; compare Dickey Act, former Wat. Code, §§ 13040 -13044.)[17] Each regional board is charged with formulating and adopting water quality control plans for its region and, through those plans, establishing water quality objectives that will "ensure the reasonable protection of beneficial uses [of waters of the state] and the prevention of nuisance." ( Wat. Code, §§ 13240, 13241.)
Pursuant to the Porter-Cologne Act, a regional board may issue orders to enforce its water quality control plans and, as relevant here, may issue orders mandating the cleanup and abatement of waste by any person "who has caused or permitted, causes or permits, or threatens to cause or permit any waste to be discharged or deposited where it is, or probably will be, discharged into the waters of the state." ( Wat. Code, § 13304, subd. (a).)[18]
*219 In this case, the Water Board issued a cleanup and abatement order, originally ordering only Shell to clean up and abate the petroleum residue and waste at the Site. On this appeal, Barclay advances several reasons why, in its view, the Water Board erred in adding it as a responsible party to the RCAO and why the superior court erred in sustaining that order.
II. Standards of Review
"A party aggrieved by a final decision or order of a regional board ... may obtain review of the decision or order of the regional board in the superior court by filing in the court a petition for writ of mandate." ( Wat. Code, § 13330, subd. (b).) The petition for writ of mandate is governed by Code of Civil Procedure section 1094.5, subdivision (c), and "the court shall exercise its independent judgment on the evidence." ( Wat. Code, § 13330, subd. (e).) " 'In exercising its independent judgment, a trial court must afford a strong presumption of correctness concerning the administrative findings, and the party challenging the administrative decision bears the burden of convincing the court that the administrative findings are contrary to the weight of the evidence.' " ( Building Industry Assn. of San Diego County v. State Water Resources Control Bd. (2004) 124 Cal.App.4th 866, 879, 22 Cal.Rptr.3d 128.) An "abuse of discretion is established if the court determines that the *498 findings are not supported by substantial evidence in the light of the whole record." ( Code Civ. Proc., § 1094.5, subd. (c).)
"The independent judgment standard in which the trial court determines whether administrative findings are supported by the weight of the evidence differs from the substantial evidence standard of review. ( Alberda v. Board of Retirement of Fresno County Employees' Retirement Assn. (2013) 214 Cal.App.4th 426, 435, 153 Cal.Rptr.3d 823 ( Alberda ). ) 'In substantial evidence review, the reviewing court defers to the factual findings made below. It does not weigh the evidence presented by both parties to determine whose position is favored by a preponderance. Instead, it determines whether the evidence the prevailing party presented was substantial-or, as it is often put, whether any rational finder of fact could have made the finding that was made below. If so, the decision must stand.' ( Ibid. , italics omitted.) In contrast, under the independent judgment standard, 'the trial court begins its review with a presumption that the administrative findings are correct, it does not defer to the fact finder below and accept its findings whenever substantial evidence supports them. Instead, it must weigh all the evidence for itself and make its own decision about which party's position is supported by a preponderance. [Citation.] The question is not whether any rational fact finder could make the finding below, but whether the reviewing court believed the finding actually was correct.' ( Ibid. , italics omitted.)" ( Coastal Environmental Rights Foundation v. California Regional Water Quality Control Bd. (2017) 12 Cal.App.5th 178, 187-188, 218 Cal.Rptr.3d 596 ; see Marina County Water Dist. v. State Water Resources Control Bd. (1984) 163 Cal.App.3d 132, 138, 209 Cal.Rptr. 212.)
"Where, 'as here, the trial court is required to review an administrative decision under the independent judgment standard of review, the standard of review on appeal of the trial court's determination is the substantial evidence test. [Citations.]' ( Fukuda [v. City of Angels (1999) ] 20 Cal.4th [805,] 824 [85 Cal.Rptr.2d 696, 977 P.2d 693].) '[W]e review its factual determinations under the substantial evidence standard and its legal determinations under the de novo standard. [Citations.]
*220 "[W]e are not bound by the legal determinations made by the state or regional agencies or by the trial court. [Citation.] But we must give appropriate consideration to an administrative agency's expertise underlying its interpretation of an applicable statute." [Citation.]' ( Coastal Environmental Rights Foundation v. California Regional Water Quality Control Bd. [, supra ,] 12 Cal.App.5th [at p.] 190 [218 Cal.Rptr.3d 596].)" ( Monterey Coastkeeper v. State Water Resources Control Bd. (2018) 28 Cal.App.5th 342, 361, 239 Cal.Rptr.3d 140 ; accord, Alberda , supra , 214 Cal.App.4th at p. 434, 153 Cal.Rptr.3d 823 ; Rosenblit v. Superior Court (1991) 231 Cal.App.3d 1434, 1442, 282 Cal.Rptr. 819 [appellate review of questions of law is de novo].)
*499 III. The parties' requests for judicial notice; Barclay's claim that the trial court wrongly rejected evidentiary materials it proffered ***
IV. Compliance with the Administrative Procedure Act and its Bill of Rights
A. The APA's provisions do not automatically apply to state agencies, including the Water Board
The APA ( Gov. Code, §§ 11340 - 11529 ) provides that adjudicative proceedings,[24] and orders made therein by administrative agencies, must comply with hearing procedures set out in the APA, when the APA is made applicable to those proceedings.
Since 1995, the APA has included a Bill of Rights ( Gov. Code, §§ 11425.10 - 11425.60 ) which "specifies the minimum due process ... requirements that must be satisfied" in adjudicative proceedings conducted by state agencies. (Cal. Law Revision Com. com., Deering's Ann. Gov. Code (2010 ed.) foll. § 11425.10, p. 133.) These due process requirements can be satisfied, depending on certain factors, by compliance with either "formal" or "informal" hearing procedures. ( Gov. Code, § 11500 et seq. [formal proceedings] and § 11445.10 et seq. [informal proceedings], respectively.)
Barclay contends the procedures utilized by the Water Board in determining it was a discharger and in adding it as a responsible party in the RCAO violated the Bill of Rights. It bases its argument on the declarative statement in its opening brief that "Under California's Administrative Procedure Act, every adjudicative proceeding conducted by a state agency-including proceedings considering the issuance of cleanup orders-must follow either formal or informal hearing procedures." As authority for this argument, Barclay relies on our Supreme Court's opinion in Department of Alcoholic Beverage Control v. Alcoholic Control Appeals Bd. (2006) 40 Cal.4th 1, 50 Cal.Rptr.3d 585, 145 P.3d 462 ( ABC ).
Barclay misunderstands both the application of the threshold or gateway section of the APA and the manner in which ABC applies to the present case.
*500 Government Code section 11410.10 states: "This chapter applies to a decision by an agency if, under the federal or state Constitution or a federal or state statute, an evidentiary hearing for determination of facts is required for formulation and issuance of the decision."
*221 We begin by determining the meaning of this statute.
" ' "When we interpret a statute, '[o]ur fundamental task ... is to determine the Legislature's intent so as to effectuate the law's purpose. We first examine the statutory language, giving it a plain and commonsense meaning. We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment. If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy.' [Citation.] 'Furthermore, we consider portions of a statute in the context of the entire statute and the statutory scheme of which it is a part, giving significance to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose.' " ' " ( Hassell v. Bird (2018) 5 Cal.5th 522, 540, 234 Cal.Rptr.3d 867, 420 P.3d 776 ; accord, City of San Jose v. Superior Court (2017) 2 Cal.5th 608, 616-617, 214 Cal.Rptr.3d 274, 389 P.3d 848.)
The meaning of Government Code section 11410.10 is unambiguous: The reference to "this chapter" is to Chapter 4.5 of Part 1 of Division 3 of Title 2 of the Government Code. Provisions regarding the APA Bill of Rights are set out in Article 7 of this chapter. Thus, for any article in this chapter to be applicable to the Water Board decision at issue, there must be a provision of the Water Code (or some other statute[25] ) that makes the APA applicable.
Barclay has cited no such statute, nor has our independent research identified one; the Water Code contains no statute meeting the requirement of Government Code section 11410.10 for adoption of the APA in the proceedings reviewed in this case.
Instead, as in this case, when the Water Board acts pursuant to Water Code sections 13267 and 13304, the Legislature provided for review of such actions following issuance of cleanup and abatement orders by the state water board and by the courts, as we shall discuss. ( Wat. Code, §§ 13320 & 13330, respectively.)
*501 Water Code section 13267 authorizes a regional water board, or the state board, to investigate potential threats to the quality of the waters of the state,[26] including on an emergency basis. This investigative authority of the regional water boards includes (a) the right to ask anyone who has discharged, discharges or is discharging, or is suspected of discharging, or proposes to discharge waste that could affect the quality of the waters of the state to provide the water board with technical and monitoring reports under penalty of perjury; (b) the right to inspect facilities to determine compliance with waste discharge requirements; and (c) the right to issue cleanup and abatement orders to remediate the discharge. ( Wat. Code, §§ 13267 & 13304, respectively.)[27]
*222 The Legislature's selection of a postcleanup order administrative and judicial review process likely is the result of its determination that the potential threat to the public from waters which are polluted or otherwise present a threat to their health and well-being warrants the later placement and availability of the review process.
The Water Code also provides that "all current record owners of fee title to the site of the proposed action [be] notified of the proposed action by the state board or regional board" (§ 13307.1, subd. (a)), also requiring that the state and regional water boards "shall take all reasonable steps necessary to accommodate responsible landowner participation in the cleanup or site closure process and shall consider all input and recommendations from any responsible landowner wishing to participate." (§ 13307.1, subd. (b).)
Even though Barclay is not a current owner, the Water Board provided it with extensive access to the process in which the Water Board engaged prior to issuance of the RCAO; Barclay had no further statutory right to participate.
This determination does not end our consideration of Barclay's contention. We will address other potential sources of application of the APA in this case-whether either the federal or state Constitutions requires compliance with the APA-after addressing Barclay's argument that the holding in ABC mandated the Water Board's compliance with the APA.
Barclay's reliance on ABC to support its claim that the APA and its Bill of Rights are applicable in this case is misplaced. The APA applied to the *502 proceeding under review in ABC because the Legislature expressly so provided in Business and Professions Code section 24300.[28] By contrast, in the present case, no statute provides for the action of the Water Board at issue here to be subject to the APA, and thus applying the plain language of section 11410.10, Chapter 4.5 of the Government Code, the APA does not apply to the proceedings which led to issuance of the RCAO. Thus, there is no statutory basis for application of the APA to Barclay's claims and the trial court's determination that the APA did not apply was correct. (See Basurto v. Imperial Irrigation District (2012) 211 Cal.App.4th 866, 881-882, 150 Cal.Rptr.3d 145 [rejecting argument that the APA applies unless a state agency is specifically excepted from its coverage]; see also Schutte & Koerting, Inc. v. Regional Water Quality Control Bd. (2007) 158 Cal.App.4th 1373, 1387, 71 Cal.Rptr.3d 54 ( Schutte ).)[29] *223 The determination that the APA does not apply to proceedings such as those we now review is also supported by the statutory history of the Water Code. When the Dickey Act was adopted, its section 13061 expressly required that the then-operative version of the APA apply to proceedings concerning whether there had been a discharge contrary to the requirements of the Dickey Act.[30] This requirement was removed when the Porter-Cologne Act was adopted. (Compare Stats. 1949, ch. 1549 with Stats. 1969, ch. 482.) Had the Legislature intended to have the APA apply to proceedings such as those now at issue, it had the language at hand by which *503 to continue that requirement; it did not do so. (See Bertch v. Social Welfare Dept. (1955) 45 Cal.2d 524, 289 P.2d 485 [affirming limitation on application of the former APA as stated in former Gov. Code, § 11501 ]; overruled on other grounds in Frink v. Prod (1982) 31 Cal.3d 166, 180, 181 Cal.Rptr. 893, 643 P.2d 476.)
B. Water Board regulations applicable but for Barclay's waiver
We now consider a separate provision of Chapter 3 of the APA which also requires analysis in connection with Barclay's overarching contention that the Water Board violated Barclay's procedural rights by failing to apply the Bill of Rights.
Barclay contends specifically that the Bill of Rights is applicable in this case because Government Code section 11410.40 provides that an agency "may adopt this chapter or any of its provisions for the formulation and issuance of a decision, even though the agency or decision is [otherwise] exempt from application of this chapter."[31]
Barclay points out in this regard that the State Board did adopt a regulation making the Bill of Rights applicable to proceedings before it, California Code of Regulations, title 23, section 648, subdivision (b).[32] This regulation provides: "(b) Incorporation of Applicable Statutes. Except as otherwise provided, all adjudicative proceedings before the State Board, the Regional Boards, or hearing officers or panels appointed by any of those Boards shall be governed by these regulations, chapter 4.5 of the [APA], sections 801 - 805 of the Evidence Code [addressing expert *224 and opinion testimony], and section 11513 of the Government Code."[33] *504 While the regulation cited by Barclay so provides, there are other regulations that must be considered in assessing whether Barclay's contention has merit.
Subdivision (c) of section 648, title 23 of the California Code of Regulations, limits application of the provisions Barclay seeks to apply. This subdivision provides in part: "Except as provided in subdivision (b) of this section, chapter 5 of the [APA] does not apply to hearings before the State Board or any of the Regional Boards, or hearing officers or panels appointed by those Boards."
Reading subdivisions (b) and (c) of section 648 of title 23 of the California Code of Regulations together, the resulting rule implementing the potential application of the APA according to subdivision (c) is that no provision of the APA applies unless subdivision (b) requires it: subdivision (b) explains that the APA applies-except when another provision states that it does not apply.
We find the rule operative in the present case in subdivision (d) of the section 648 and in section 648.7 of title 23 of the California Code of Regulations. The former authorizes the agency officer presiding over a matter to "waive any requirements in these regulations pertaining to the conduct of adjudicative proceedings including but not limited to the introduction of evidence, the order of proceeding, the examination or cross-examination of witnesses, and the presentation of argument, so long as those requirements are not mandated by state or federal statute or by the state or federal constitutions."
The latter provides that a party waives provisions otherwise applicable if the request to have them apply is untimely. Thus, California Code of Regulations, title 23, section 648.7 provides: "An objection by a party, either *505 in writing or at the hearing, to the decision to hold an informal hearing shall be resolved by the presiding *225 officer before going ahead under the informal procedure. Failure to make a timely objection to the use of informal hearing procedures before those procedures are used will constitute consent to an informal hearing. " (Italics added.)
This requirement for timely assertion of any objection to the hearing procedure utilized by the Water Board appears in a statute as well. Government Code section 11445.30 includes a requirement that any objection by a party to use of the informal hearing procedure shall be made in the party's pleading. (Id. , subd. (b).) This mandate for timely raising this procedural point is emphasized in the language of subdivision (c) of Government Code section 11445.30, which states: If an objection is made to use of the informal hearing procedure, it "shall be resolved by the presiding officer before the hearing on the basis of the pleadings and any written submissions."[34] (Id. , subd. (c).)
There is no dispute among the parties in the present matter that the proceedings before the Water Board were conducted informally. At the same time, the record makes clear that, beginning with the notice issued on October 31, 2013, the proceedings were conducted by a series of written submissions.
And, these proceedings were extensive; Barclay made multiple written responses to requests to it made by the Water Board, and was given multiple opportunities to respond to submissions made by Shell and to memoranda and to documents prepared in draft by the Water Board. Barclay's submissions included declarations of lay and expert witnesses, all overseen and explained in detail by its counsel. During this period, Barclay asked for, and was granted, lengthy extensions of time in which to prepare and present its own extensive arguments and documentary submissions and to respond to submissions by Shell and by Water Board SCP Staff. Barclay's submissions totaled over 11,000 pages.
It was not until December 24, 2014, that Barclay first asked for a formal hearing. In response, the Water Board explained that the procedure which had *506 been utilized for over a year had allowed for orderly and extensive submissions by all parties and for extensive explications of views by the parties-and denied the request.[35]
Thus, pursuant to section 648.7 of title 23, California Code of Regulations, by waiting over a year to make a request for a formal hearing-during which it had fully participated in the Water Board's inquiry-Barclay waived the opportunity to proceed more formally. In addition, we perceive no denial of fair hearing procedures given the extensive and unfettered multiple opportunities Barclay was given-and accepted-to express and document *226 its position through counsel and expert and lay witnesses.
C. Relationship of APA fair hearing procedures and Code of Civil Procedure section 1094.5
Barclay contends the APA and its Bill of Rights necessarily apply in this case because the intent of the drafters of the APA was to incorporate the terms of the APA into adjudication of petitions for writs of mandate regarding regional water board decisions in superior court pursuant to Code of Civil Procedure section 1094.5. While Barclay correctly acknowledges that this statute is the means by which actions of regional water boards are reviewed in superior court, it errs in its claim that the APA is engrafted into the Code of Civil Procedure statute by reference to that provision in Water Code section 13330.[36]
In support of this contention Barclay cites the Law Revision Commission comment to Government Code section 11410.10, which states, "[t]he coverage of [the APA] is the same as coverage by the existing provision for administrative mandamus under Code of Civil Procedure Section 1094.5(a)." (Cal. Law Revision Com. com., Deering's Ann. Gov. Code, supra , foll. § 1410.10, p. 120.)
What Barclay does not acknowledge, and as we have explained above, is that for Government Code section 11410.10 to apply, another statute- in this *507 case a provision of the Water Code-must state that the APA is applicable. The Law Revision Commission comment does not address this aspect of Government Code section 11410.10, and nothing in the Law Revision Commission comment suggests otherwise. Thus, the comment does not provide support for Barclay's claim.
Barclay does not err, however, in noting that there is a fair hearing provision within the text of Code of Civil Procedure section 1094.5 which must be considered. Code of Civil Procedure 1094.5, subdivision (b) provides in part: "The inquiry in such a case shall extend to the questions whether the respondent has proceeded without, or in excess of, jurisdiction; whether there was a fair trial ; and whether there was any prejudicial abuse of discretion." (Italics added.)
Relying on the italicized clause, Barclay contends, "[t]he APA applies to any state agency proceedings reviewable under Code of Civil Procedure section 1094.5, subdivision (a)." In addition, it argues "the text of the APA itself makes clear that ... [if] section 1094.5 applies to the review of an agency decision, then that decision is subject to the APA." As with the claim just discussed, Barclay supports this claim with citations to Government Code section 11410.10 and to a California Law Revision Commission comment to this Government Code section.
Barclay's argument based on the cited Law Revision Commission comment lacks persuasive force. The passage upon which Barclay relies is an introductory sentence of a paragraph of the Law Revision Commission's comment on this section, which reads in full: "The coverage of this chapter is the same as coverage by the existing provision for administrative mandamus under Code of Civil Procedure section 1094.5(a)." (Cal. Law Revision Com. com., Deering's Ann. Gov. Code, supra , foll. § 1410.10, p. 120.) That is not a statement that this Government Code provision is *227 engrafted into Code of Civil Procedure section 1094.5 ; an express statement of incorporation would be required to accomplish this task. And, the remainder of the cited paragraph describes when and how Code of Civil Procedure section 1094.5 applies to review of actions by administrative agencies generally and focuses on how that section had been applied to review actions of state agencies prior to enactment of the APA.
There is nothing in the language upon which Barclay relies indicating that Government Code section 11410.10 is to be read to ignore the clause in it that limits application of the APA as set out in that section. For Barclay's argument to have merit, section 11410.10 must contain language that the APA applies to actions reviewed under Code of Civil Procedure section 1094.5. Yet, neither the text of either statute nor the Law Revision Commission *508 comment supports Barclay's argument. Thus, Barclay's contention that the Legislature engrafted the APA into section 1094.5-without any statutory statement to that effect-is mistaken.
Nor does the circumstance that Water Code section 13330, subdivision (e) states that a court proceeding such as the present one may be pursued by a petition under Code of Civil Procedure section 1094.5 support Barclay's argument. If the Legislature had intended that the APA or its Bill of Rights apply in such a proceeding notwithstanding the clear language of Government Code section 11410.10, it would have so stated in the same statute. The Legislature did not do so.[37]
D. Constitutional due process claims
Barclay contends the APA and its Bill of Rights apply based on the clause in Government Code section 11410.10 that makes due process principles applicable "if, under the federal or state Constitution ... an evidentiary hearing for determination of facts is required for formulation and issuance of the decision."[38]
*228 *509 The Water Board and Shell raise a threshold issue, arguing Barclay waived its due process claim by "fail[ing] to exhaust available administrative remedies" below. Barclay responds to these arguments in a footnote in its reply brief, arguing it did raise its due process objection before the RCAO was issued, citing its December 24, 2014 letter, which included its request for a formal hearing before the Water Board at which it would "directly address the question whether Barclay is a 'discharger' under the Water Code," and in two later letters (those of January 6 and 16, 2015), in which it also sought a formal hearing.
There are three difficulties with Barclay's reply counter-arguments. First, the same regulations upon which it relies for other contentions-title 23 of the California Code of Regulations, sections 648 through 648.9-include the provision discussed above requiring that a party seeking to invoke more formal hearing requirements (to the extent the Water Board has adopted them) must make that claim at the outset of the investigation , or it is waived. ( Cal. Code Regs., tit. 23, § 648.7 ["Failure to make a timely objection to the use of informal hearing procedures before those procedures are used will constitute consent to an informal hearing."] ) Thus, the Water Board's regulations gave notice of how and when to make the claims Barclay now seeks to assert; those regulations also indicate that Barclay's request that its claims be resolved by a procedure different than that in which it had participated without objection for more than a year was untimely.
Second, even if Barclay had not waived its argument, it does not provide citations to the record that provide support for its claim.[39] Third, the cases upon which it relies do not support its defense. Barclay's reliance on Azusa Land Reclamation Co. v. Main San Gabriel Basin Watermaster (1997) 52 Cal.App.4th 1165, 1211-1212, 61 Cal.Rptr.2d 447, is inapposite as that case addresses a very different procedural circumstance, whether a party must contest an exemption determination under the California Environmental Quality Act ( Pub. Resources Code, § 21000 et seq. ) prior to seeking review of that determination in court when no administrative remedy is provided. That court observed that the exhaustion requirement applied when there was an opportunity for "public comment" or there is a public hearing; however, a party could not be required to exhaust when the agency had not yet issued the ruling and the statute of limitations might expire if the party did not file suit even though the ruling had not yet been made. ( *510 Azusa Land, supra , 52 Cal.App.4th at pp. 1209-1211, 61 Cal.Rptr.2d 447.) In this case, there were extensive opportunities for comment of which Barclay took full advantage.
The holding in the second case, Schutte, supra , 158 Cal.App.4th 1373, 71 Cal.Rptr.3d 54, of relevance here, is that a *229 party which appealed to the State Water Quality Control Board from an adverse determination by a regional water quality control board and has been denied review by the state board, need not return to the regional water board but must file its petition for writ of mandate within the time required by Water Code section 13330, subdivision (b). It is in the context of compliance with the filing deadline of this statute that the court in Schutte addresses the issue of exhaustion. Nothing in Schutte addresses the scope of issues that must first be presented to a regional water board to meet the "jurisdictional prerequisite" of exhaustion of administrative remedies. (See Schutte , at p. 1385, 71 Cal.Rptr.3d 54, quoting Tahoe Vista Concerned Citizens v. County of Placer (2000) 81 Cal.App.4th 577, 589, 96 Cal.Rptr.2d 880.)
Even if Barclay had not waived this issue, we would find Barclay's contention lacking in merit for the following reasons.
Barclay bases its due process claim on Mathews, supra , 424 U.S. 319, 335, 96 S.Ct. 893, Leslie's Pool Mart, Inc. v. Department of Food & Agriculture (1990) 223 Cal.App.3d 1524, 273 Cal.Rptr. 373 ( Leslie's ), and Lassiter v. Department of Social Services (1981) 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640.
As the Water Board argues, Mathews calls for a more nuanced approach than that which Barclay advocates. Thus, in the course of its opinion, the Mathews court points out that what is needed to comport with federal due process principles is "some form of hearing ... before an individual is finally deprived of a property interest." ( Mathews, supra , 424 U.S. at p. 333, 96 S.Ct. 893.) The Mathews court then listed a series of cases in which the principles of due process were vindicated, some by an evidentiary hearing prior to deprivation of a property interest, and others in which due process was achieved by a hearing after the action was taken, e.g., when the sanction of termination of employment had been effected. ( Id. at pp. 333-334, 96 S.Ct. 893.)
"These decisions underscore the truism that ' "[d]ue process," unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances.' Cafeteria Workers v. McElroy , 367 U.S. 886, 895 [81 S.Ct. 1743, 6 L.Ed.2d 1230] (1961). '[D]ue process is flexible and calls for such procedural protections as the particular situation demands.' Morrissey v. Brewer , 408 U.S. 471, 481 [92 S.Ct. 2593, 33 L.Ed.2d 484] (1972). Accordingly, resolution of the issue whether the administrative procedures provided here are constitutionally sufficient requires analysis of the governmental and private interests that are affected.
*511 Arnett v. Kennedy , [416 U.S. 134,] 167-168 [94 S.Ct. 1633, 40 L.Ed.2d 15] (1974) (Powell, J., concurring in part); Goldberg v. Kelly , [397 U.S. 254,] 263-266 [90 S.Ct. 1011, 25 L.Ed.2d 287] (1970) ; Cafeteria Workers v. McElroy, supra , at 895 [81 S.Ct. 1743]. More precisely, our prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. See, e. g., Goldberg v. Kelly, supra , at 263-271 [90 S.Ct. 1011]." ( Mathews, supra , 424 U.S. at pp. 334-335, 96 S.Ct. 893.)
*230 In addressing the three factors identified in Mathews , Barclay argues with respect to the first, its private interest, that it has a profound private interest in having a formal hearing before it is added as a responsible party to the RCAO because that action results in it being jointly and severally liable for remediation costs at the Site, which are estimated to be $146 million. Addressing the second factor, the risk of an erroneous deprivation of that private interest, Barclay argues there is a "dense and disputed factual record spanning tens of thousands of pages, concerning conduct that occurred more than fifty years ago." Third, the government's interest is minor as there is no need for an early resolution of the matter because "Shell is already cleaning up the site, and the only question is whether Barclay will defray Shell's costs." Barclay also points out there is no harm in any delay based on "the fact that it took four years for Barclay to be added to the Order."
We are not persuaded by Barclay's arguments. As the Water Board argues, also relying on Mathews , Barclay's right to due process was met through the several opportunities which the Water Board provided to Barclay to address the entire range of issues presented in the proceeding before it. This is amply demonstrated by Barclay providing thousands of pages addressing the issues, including multiple lengthy letters from its lawyers explaining Barclay's views on the issues presented, together with several expert witness and lay witness declarations, and doing so as part of an iterative process in which there were extensive analyses of the issues as they developed over the multi-year course of the Water Board's investigation of the Site and the preparation and revision of the RCAO. As the Water Board argues, these opportunities allowed Barclay to fully express its views as to the impact of its being added as a responsible party to the RCAO and to fully address Barclay's "private interest."
With respect to Barclay's claim that there is a "dense and disputed factual record," the scientific evidence in the record conclusively establishes there is *512 an extensive and continuing risk of harm-magnified in substantial part by Barclay's activities at the Site-to the people who live at the Site, which was graded by Barclay's designee to create the lots sold by Barclay to the public.[40] In this case, no additional procedural safeguard is required: Barclay was given several extended opportunities to address the issues and had the right to obtain this appellate review of the Water Board's determination-a postadministrative agency action review which meets the constitutional standard articulated in Mathews.
The third Mathews factor, the governmental interest, is substantial. Among the functions of the Water Board is the protection *231 and improvement of the quality of the " '[w]aters of the state' " consistent with the state goal of providing "a decent home and suitable living environment for every Californian." ( Wat. Code, §§ 13050, subd. (e), 13142, subd. (c).) It is evident in this case that the RCAO was issued to further this objective. Barclay's argument that there is no hurry because the process of identifying those responsible has taken four years fails to acknowledge that the delay was in significant part the result of Barclay's own multiple requests for extensions of time so that it could present its views and materials to support them-at a pace Barclay found appropriate.
We do not agree with Barclay that the circumstance that Shell is already cleaning the Site should be a consideration in whether Barclay should have obtained a formal hearing prior to issuance of the RCAO. In addition to Barclay's failure to raise this as an issue below, we agree with the Water Board that this is not an issue that should be addressed as part of analysis of which parties may bear responsibility for cleanup and abatement.
The parties dispute the application of Machado v. State Water Resources Control Bd. (2001) 90 Cal.App.4th 720, 109 Cal.Rptr.2d 116 ( Machado ), to the present case. There, the Third District Court of Appeal addressed whether the due process rights of the appellants in that case (a dairy) were violated by the issuance of a cleanup and abatement order prior to a hearing. Relying *513 in large part on the principles articulated in Mathews , the Machado court held that due process principles were satisfied when the hearing is provided following issuance of a cleanup and abatement order. ( Machado, supra , 90 Cal.App.4th at pp. 725-726, 109 Cal.Rptr.2d 116.) In reaching this conclusion, the Machado court analyzed the three Mathews factors and concluded the dairy had been afforded due process, reasoning that because the cleanup and abatement order there did not impose criminal or civil penalties there was no substantial deprivation of the private interest of the dairy. ( Machado, supra , 90 Cal.App.4th at p. 726, 109 Cal.Rptr.2d 116.)
With respect to the issue of timing of the availability of a fair hearing on the Water Board's action, the Machado court specifically found the dairy's right to due process was met by its right to seek review of the cleanup order before the state board and in its right to challenge the regional water board's order through a petition for writ of mandate. ( Machado, supra , 90 Cal.App.4th at p. 726, 109 Cal.Rptr.2d 116.) In support of this determination, the court relied on Mathews : "As the United States Supreme Court noted, 'The Due Process Clause simply does not mandate that all governmental decisionmaking comply with standards that assure perfect, error-free determinations. [Citation.] ... [Citation.] [W]hen prompt postdeprivation review is available for correction of administrative error, we have generally required no more than that the predeprivation procedures used be designed to provide a reasonably reliable basis for concluding that the facts justifying the official action are as a responsible governmental official warrants them to be.' ( Mackey v. Montrym (1979) 443 U.S. 1, 13 [99 S.Ct. 2612, 61 L.Ed.2d 321] ( Mackey ).) Moreover, in assessing what process is due, a reviewing court must give substantial deference to the good faith judgment of the agency that its procedures afford fair consideration of a party's claims. ( Mohilef v. Janovici (1996) 51 Cal.App.4th 267, 289 [58 Cal.Rptr.2d 721] ; Mathews, supra , 424 U.S. at p. 349 [96 S.Ct. 893].)" ( Machado, supra , 90 Cal.App.4th at p. 726, 109 Cal.Rptr.2d 116.)
*232 Addressing the third Mathews factor, the Machado court explained the need for issuance of the cleanup order with reference to the reasons for a governmental water quality control program: "That brings us to the third factor in Mathews , the governmental interest involved. The statewide program for water quality control is designed to ensure the health, safety and welfare of all Californians. ( § 13000.) Cleanup and abatement orders serve an important function in meeting this goal." ( Machado, supra , 90 Cal.App.4th at p. 727, 109 Cal.Rptr.2d 116, citing Wat. Code, § 13304, subd. (a).)
We appreciate that there is a difference between the facts in Machado and those in the present case; there, the dairy "was discharging manure and wastewater into a ditch that flowed into a drainage system and then into the Sacramento-San Joaquin Delta." ( Machado, supra , 90 Cal.App.4th at p. 723, 109 Cal.Rptr.2d 116.)
*514 That the hazardous substances in the present case are buried is not a significant enough distinction to overcome the health hazards which the facts conclusively establish. Indeed, the Porter-Cologne Act defines the key term "waters of the state" as "any surface water or groundwater .... ( Wat. Code, § 13050, subd. (e), italics added.) Thus, the governmental interest in protecting both the persons living at the Site and the aquifers beneath it are appropriately given great weight whether the water flows on, or under, the surface.[41]
In our weighing of the three Mathews factors, we conclude that Barclay was accorded appropriate due process by pursuing its claims before the State Board, in the trial court, and now on appeal. As the United States Supreme Court held in Mathews , the specific form which due process takes is flexible and may vary with the nature of the issue presented; a full evidentiary hearing is not always required prior to an agency issuing an order which is subject to post-issuance review, as in the present case. (See Matthews, supra , 424 U.S. at p. 334, 96 S.Ct. 893.)
Barclay's reliance on Leslie's, supra , 223 Cal.App.3d 1524, 273 Cal.Rptr. 373, a case predating Machado , is unpersuasive. There, the agency seized a product from the plaintiff's retail stores without notice because it was being sold without Leslie's first having obtained the registration required by the Economic Poisons Act ( Food & Agr. Code, § 12751 et seq. ; Leslie's , at pp. 1528-1529, 273 Cal.Rptr. 373.) The court expressly limited its holding, writing that there was no evidence the product was a threat to the environment or to the health of the public or that the product could not obtain registration when applied for. The Leslie's court also noted the Economic Poisons Act does not provide for a postseizure review. ( Leslie's , at p. 1536, 273 Cal.Rptr. 373.)
Barclay's circumstances are materially different from those in Leslie's. Here, no property was seized; no registerable merchandise on store shelves ready for sale was confiscated. Unlike the action without notice that characterizes the facts in Leslie's , in this case, the allocation of shared responsibility for the cleanup of a hazardous substance came only after an extended period of time and much discussion and analysis-the Water Board having given multiple notices to Barclay and having allowed it multiple opportunities to be heard *233 on the merits before the RCAO was issued-with the additional availability of court review of the Water Board's determination. And, rather than the containers on the store shelves in Leslie's , which literally contained *515 the potentially hazardous substance, in the present case, there is substantial evidence that hazardous substances are already in, and continue to leach into, the water supply-with the potential to endanger human health.
DISPOSITION
The judgment is affirmed. Respondents shall recover their costs on appeal.
We concur:
EDMON, P.J.
EGERTON, J.

Retired Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

The acronym RAP stands for remedial action plan. (Dole, supra , 242 Cal.App.4th at p. 898, 195 Cal.Rptr.3d 461.)

The first leak in the record is one noted in a 1943 status report, which indicates a leak in the lining of Reservoir No. 6, which Shell repaired. Other leaks and the cost of their repair are documented in later Shell memoranda.

The contents were characterized in contemporaneous Shell internal reports as "unrecoverable" and as "non-usable."

The letter was addressed to Barclay-Hollander-Curci. The parties do not dispute that the correct party to these proceedings is Barclay, which is the entity surviving after several transfers of ownership of the Site.

Barclay does not dispute that it is responsible for the actions of Lomita at the Site.

The January 27, 1966 letter from PSE to Lomita also states that "Prior to placing fill on the broken bottom slab[s], hand auger holes will be drilled to examine existing underlying soils."

Although Barclay's opening brief indicates the final sales were made in 1971, the citation to the record on this point refers to a 1960 tract map and therefore does not substantiate that date. The date has relevance to determining the law applicable to Barclay's claim that it is entitled to rely on the safe harbor of Water Code section 13304, subdivision (j). We address this issue in part VII of this opinion.

The Water Board cited Water Code sections 13304 and 13267 as authority for this order. Water Code section 13304 provides, in pertinent part:
"(a) A person who has discharged or discharges waste into the waters of this state in violation of any waste discharge requirement or other order or prohibition issued by a regional board or the state board, or who has caused or permitted, causes or permits, or threatens to cause or permit any waste to be discharged or deposited where it is, or probably will be, discharged into the waters of the state and creates, or threatens to create, a condition of pollution or nuisance, shall, upon order of the regional board, clean up the waste or abate the effects of the waste....
"....
"(j) This section does not impose any new liability for acts occurring before January 1, 1981, if the acts were not in violation of existing laws or regulations at the time they occurred."
Water Code section 13267 provides, in pertinent part:
"(a) A regional board, in establishing or reviewing any water quality control plan or waste discharge requirements, or in connection with any action relating to any plan or requirement authorized by this division, may investigate the quality of any waters of the state within its region.
(b)(1) In conducting an investigation specified in subdivision (a), the regional board may require that any person who has discharged, discharges, or is suspected of having discharged or discharging, or who proposes to discharge waste within its region, or any citizen or domiciliary, or political agency or entity of this state who has discharged, discharges, or is suspected of having discharged or discharging, or who proposes to discharge, waste outside of its region that could affect the quality of waters within its region shall furnish, under penalty of perjury, technical or monitoring program reports which the regional board requires. The burden, including costs, of these reports shall bear a reasonable relationship to the need for the report and the benefits to be obtained from the reports. In requiring those reports, the regional board shall provide the person with a written explanation with regard to the need for the reports, and shall identify the evidence that supports requiring that person to provide the reports.
"....
"(e) As used in this section, 'evidence' means any relevant evidence on which responsible persons are accustomed to rely in the conduct of serious affairs, regardless of the existence of any common law or statutory rule which might make improper the admission of the evidence over objection in a civil action."

This order was issued pursuant to Water Code section 13267.

In this filing, Dole acknowledged that Barclay carried liability insurance and that "in that limited sense," it has assets. Dole continued to contest that Barclay was a discharger and responsible party, but conceded that if an RCAO were to issue, Barclay was the appropriate party to be named in it.

The parties have not cited, and we did not locate in the record, any comments that may have been received from the public.

This set of documents is the subject of the first of Barclay's two requests for judicial notice filed in this court. We address both of Barclay's requests for judicial notice in section III, below.

These rulings were made by Smith, the Chief Deputy Executive Officer who had been designated by the Water Board's Executive Officer to act with respect to the RCAO.

The reference is to Acosta v. Shell Oil Co. (Super. Ct. L.A. County, No. NC053643), one of the actions which was addressed in our opinion in Dole, supra , 242 Cal.App.4th 894, 195 Cal.Rptr.3d 461. See above, at pages 208 and 208-09.

Water Code section 13304, subdivision (j) provides a safe harbor from sanction under the Porter-Cologne Water Quality Control Act if the conduct otherwise subject to that law occurred prior to 1981 and complied with "existing laws or regulations at the time [the conduct] occurred."
The Water Board explained in a footnote to paragraph 13 of the RCAO that Barclay's conduct did not qualify for this safe harbor based on the Water Board findings that Barclay's actions were contrary to Health and Safety Code section 5411, Fish and Game Code section 5650 and Los Angeles County Code section 20.36.010.

Barclay does not also argue, based on one or more of these claims, that the Water Board failed to proceed in the manner required by law and that Code of Civil Procedure section 1094.5, under which this case was filed in the trial court, requires that the judgment be reversed. Nevertheless, we understand that to be the import of the first of Barclay's contentions.

Future references to the Porter-Cologne Act will be made to the relevant Water Code section number; references to provisions of the Dickey Act will be made to the relevant "former" Water Code section number.

At the time of Barclay's actions in the present case (principally, through its agent Lomita), the predecessor legislation addressing, inter alia, water quality, the Dickey Act, was in effect. While the administrative structure of the statewide water control program was similar, and the remedies available and at issue in this case are those provided for under the Porter-Cologne Act, many of the statutory provisions relevant to the issues in this appeal require consideration of provisions of the Dickey Act rather than those of the Porter-Cologne Act, as we discuss in the text, below.

See footnote *, ante .

An adjudicative proceeding is "an evidentiary hearing for determination of facts pursuant to which an agency formulates and issues a decision." (Gov. Code, § 11405.20.) A "decision" is "an agency action of specific application that determines a legal right, duty, privilege, immunity, or other legal interest of a particular person." (Gov. Code, § 11405.50.)

We consider the other qualifying language of this statute, that referencing the federal and state Constitutions, and another possible, statutory exception, in subsequent sections of this opinion.

The term "Waters of the state" means "any surface water or groundwater, including saline waters, within the boundaries of the state." (Wat. Code, § 13050, subd. (e).)

A separate provision of the Water Code, section 13301, authorizes the issuance of cease and desist orders; while that statute also requires that such orders "may be issued ... after notice and hearing," it also does not incorporate any provision of the APA. As we shall discuss, Government Code section 11410.40 provides authority for an agency to adopt portions of the APA, which the State Water Board has done. (See section IV B, below.)

Business and Professions Code section 24300, subdivision (a) provides, in relevant part: "Except as provided in Section 24203 and in this section, the proceedings shall be conducted in accordance with Chapter 5 (commencing with Section 11500) of Part 1 of Division 3 of Title 2 of the Government Code, and in all cases the department shall have all the powers granted therein." Thus, there is in the ABC case a specific statutory command that the APA is applicable to those proceedings.

The leading authority on the APA makes a similar point in his treatise on California Administrative Procedure. There, Professor Michael Asimow writes: "The APA administrative adjudication provisions do not apply to every state agency 'decision'.... Instead, by statute, those provisions apply only 'to a decision by an agency if, under the federal or state Constitution or a federal or state statute, an evidentiary hearing for determination of facts is required for formulation and issuance of the decision.' [Gov.C. § 11410.10 ]" (Asimow et al., Cal. Practice Guide: Administrative Law (The Rutter Group 2018) ¶ 4:110.)

That provision is former Water Code section 13061, which required that proceedings to address discharges potentially contrary to the Dickey Act "shall be conducted, as nearly as practicable, in accordance with the provisions of Title 2, Division 3, Part 1, Chapter 5 of the Government Code." (Former Wat. Code, § 13061 (Stats. 1949, ch. 1549, § 13061, p. 2788.) That reference was to the chapter of the Government Code which set out the version of the APA then in effect. (Stats. 1945, ch. 867, § 1, p. 1627, as amended by Stats. 1947, ch. 1425, § 1, p. 2984.). Former Government Code section 11501, subdivision (b) provided that "[t]he procedure of any agency shall be conducted pursuant to the provision of this chapter only as to those functions to which this chapter is made applicable by the statutes relating to the particular agency." (Stats. 1945, ch. 867, § 1, p. 1627 [former Gov. Code, § 11501, subd. (b) ].)

Government Code section 11410.40 provides in full: "Notwithstanding any other provision of this article, by regulation, ordinance, or other appropriate action, an agency may adopt this chapter or any of its provisions for the formulation and issuance of a decision, even though the agency or decision is exempt from application of this chapter."
The article containing the Bill of Rights (art. 6) is within the referenced chapter (Chapter 4.5 of Part 1 of Division 3 of Title 2 of the Government Code).

We take judicial notice of this and the other regulations we now discuss. (Evid. Code, §§ 452, subds. (b), (c), 459.)

California Code of Regulations, title 23, section 648, subdivision (a) defines an "adjudicative proceeding" as "an evidentiary hearing for determination of facts pursuant to which the State Board or a Regional Board formulates and issues a decision."
There is an argument that proceedings involving the issuance of a cease and desist order are not adjudicative within the meaning of this section, but instead constitute administrative investigations in which the agency offers both notice and an opportunity to participate. In the text, we explain why, assuming arguendo, the proceedings are adjudicative, Barclay was accorded extensive rights to participate and only after an extended opportunity to do so-of which it took full advantage-waived any right it may have had to a "formal proceeding."
Government Code section 11513 sets out rules of evidentiary procedure differing in several respects from those applicable in court trials, providing, inter alia: (c) "[t]he hearing need not be conducted according to technical rules relating to evidence and witnesses, except as hereinafter provided. Any relevant evidence shall be admitted if it is the sort of evidence on which responsible persons are accustomed to rely in the conduct of serious affairs, regardless of the existence of any common law or statutory rule which might make improper the admission of the evidence over objection in civil actions. [¶] (d) Hearsay evidence may be used for the purpose of supplementing or explaining other evidence but over timely objection shall not be sufficient in itself to support a finding unless it would be admissible over objection in civil actions. An objection is timely if made before submission of the case or on reconsideration."
This regulation established the authority of the Water Board and of the trial court to take into evidence the declaration of Barclay's engineer, Bach, who supervised development at the Site, even though his declaration was not made under penalty of perjury. (Cf. Code Civ. Proc., § 2015.5.) Barclay's contention that consideration of this declaration was error is without merit based on these authorities.

Government Code section 11445.40 gives broad latitude to the agency officer conducting the administrative proceeding. Its subdivision (b) provides: "In an informal hearing the presiding officer shall regulate the course of the proceeding. The presiding officer shall permit the parties and may permit others to offer written or oral comments on the issues. The presiding officer may limit the use of witnesses, testimony, evidence, and argument, and may limit or eliminate the use of pleadings, intervention, discovery, prehearing conferences, and rebuttal."

Barclay argues other regional water boards follow different procedures and makes an argument based on memoranda of the Chief Counsel of the Water Board. As the documents upon which it bases these arguments are not part of the administrative record admitted by the trial court with respect to its adjudication of Barclay's Amended Petition for Writ of Administrative Mandamus, and were not promulgated in compliance with Government Code section 11340.5, we do not consider them in our analysis of Barclay's contentions on appeal.

Water Code section 13330, subdivision (b) provides: "A party aggrieved by a final decision or order of a regional board subject to review under Section 13320 may obtain review of the decision or order of the regional board in the superior court by filing in the court a petition for writ of mandate not later than 30 days from the date on which the state board denies review."

We recognize the arguably anomalous circumstance that review of final actions by regional water boards for which the state water board has denied review is by means of a petition for writ of mandate under Code of Civil Procedure section 1094.5, which more typically is the appropriate means of review of final administrative actions following proceedings in which "a hearing is required to be given, evidence is required to be taken" (Code Civ. Proc., § 1094.5, subd. (a) ), notwithstanding that the Water Code does not call for such a hearing in connection with issuance of cleanup and abatement orders. That anomaly is a result of a drafting choice made by the Legislature. (See Schutte, supra , 158 Cal.App.4th at pp. 1383-1387, 71 Cal.Rptr.3d 54.)
There is a potential, albeit limited, incorporation of APA provisions that can apply under certain circumstances. Title 23 of the California Code of Regulations section 648.7 vests in the hearing officer "the discretion to determine whether a matter will be heard pursuant to the informal hearing procedures set forth in [the Bill of Rights]." And, title 23 of the California Code of Regulations section 648.5, subdivision (b) incorporates the Bill of Rights into procedures to be followed by the Water Board, modifying when provisions of the Bill of Rights may apply. However, as we have explained in the text, section 648.7 requires that a party make a timely objection to use of less formal procedures; the failure to do so constitutes a waiver of any right to demand that the agency conduct its inquiry in a more formal manner.

Barclay's argument based on this prong of Government Code section 11410.10 cites federal cases (with a single exception) and analyzes the issue using the three-factor federal due process test, involving inquiries into (a) the importance of the private interest at issue, (b) the risk of erroneous deprivation of that interest and the probable value of the additional safeguards sought by the private party asserting it, and (c) the governmental interest involved. (E.g., Mathews v. Eldridge (1976) 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18.) Our state constitutional due process analysis utilizes a four-factor test, adding the "dignitary interest in providing notice and hearing" to the individual. There is also a difference in how the tests are applied. (Saleeby v. State Bar (1985) 39 Cal.3d 547, 565, 216 Cal.Rptr. 367, 702 P.2d 525.)
Because Barclay's argument relies on the three-factor federal test, we address its claim in that context. And, as Barclay advances no argument that the state due process test would produce a different result, we do not address whether the outcome might be different if the four-factor state due process analysis were used. (See Saleeby v. State Bar, supra , 39 Cal.3d at p. 565, 216 Cal.Rptr. 367, 702 P.2d 525 & Asimow et al., Cal. Practice Guide: Administrative Law, supra , ¶¶ 3.181, 3.544.)

The only citations to the record which Barclay provides are to the December 24, 2014 letter and two January 2015 letters, which as we discuss in the text, above, were untimely assertions of its claim based on the regulation cited there.

Barclay's argument that there is scientific evidence contrary to other such evidence, which the Water Board found to be determinative, is not sufficient to overcome the Water Board's findings which were affirmed by the trial court in its order and judgment. The question on appeal is "whether the evidence reveals substantial support, contradicted or uncontradicted," in favor of the trial court's determination. (Yakov v. Board of Medical Examiners (1968) 68 Cal.2d 67, 72, 64 Cal.Rptr. 785, 435 P.2d 553.) The answer to that question in this case is that the evidence does establish substantial support for the factual determinations below.
Equally established is that, with knowledge of the presence of petroleum residue and waste in various forms, Barclay removed only a small portion of that material from the Site, burying most of it beneath the building pads it graded and created utilizing a mixture of petroleum residue and waste from the berms and beneath the concrete bottoms of the three reservoirs together with soil brought to the Site from elsewhere.

The Porter-Cologne Act definition is identical in relevant respects to that in the Dickey Act, which defined the term "waters of the state" as "any waters, surface or underground." (Former Wat. Code, § 13005.) We perceive no legal difference between the terms "groundwater" and "waters ... underground" as these terms are used in the Porter-Cologne Act and in the Dickey Act, respectively.